ISKCON OF POTOMAC, INC.; George Levinton, Appellees,

v.

Roger G. KENNEDY, Director National Park Services; Robert Stanton, Chief of National Capital Region; Robert E. Langston, Chief, United States Park Police, Appellants.

No. 93–5301.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1994.

Decided Aug. 8, 1995.

Sally M. Rider, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., John D. Bates, and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC, were on the briefs, argued the cause, for appellants.

David M. Liberman, with whom Durvasula S. Sastri, Washington, DC, was on the brief, argued the cause, for appellees.

Before BUCKLEY, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Opinion concurring in part and dissenting in part filed by Circuit Judge GINSBURG.

BUCKLEY, Circuit Judge:

The National Park Service appeals from a district court decision that its regulations governing solicitation and sales in the parks within the National Capital Area violate the First Amendment. The court concluded that the regulations are unconstitutional to the extent that they prohibit members of the International Society of Krishna Conscious- ness of the Potomac ("ISKCON") from soli- citing donations and selling audio tapes and religious beads within an area of the National Parks on which it had received permission to conduct a "Krishnafest" program. Accord- ingly, the court enjoined the Park Service from enforcing these regulations in an area of the National Mall adjacent to the Air and Space Museum. We affirm in part and re- verse in part.

## I. BACKGROUND

### A. Regulatory Framework

Congress has charged the Park Service with the task, among others, of

regulat[ing] the use of ... national parks [and] monuments ... by such means and measures as conform to the fundamental purpose of the said parks [and] monu- ments, ... which purpose is to conserve the scenery and the natural and historic objects ... and to provide for the enjoy- ment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (1988); *see also* 16 U.S.C. § 20 (1988) (noting that "preservation of park val- ues requires that ... public accommodations, facilities, and services ... should be provided under carefully controlled safeguards against unregulated and indiscriminate use...."). The Park Service's duty extends to areas within the National Capital Region, which include, among others, the National Mall, the Washington Monument grounds, and the Lincoln, Jefferson, and Vietnam Veterans Memorials.

The Mall, which is the site of this contro- versy, is an area of particular significance in the life of the Capital and the Nation. It extends almost two miles from the United States Capitol on the east to the Lincoln Memorial on the west and includes the grounds of the Washington Monument. This vast expanse serves a multiple of purposes, none of them commercial. It is a place where the public will relax and enjoy its landscaped vistas between visits to the eight museums and galleries that flank the eastern half of the Mall. Its lawns are used for a variety of activities ranging from kite flying,

to baseball, to picnics, to exhibitions. In season, it is filled by the crowds who come to listen to the annual Memorial Day concert or to watch the Fourth of July fireworks. It is also the place where men and women from across the country will gather in the tens of thousands to voice their protests or support causes of every kind. It is here that the constitutional rights of speech and peaceful assembly find their fullest expression.

The Park Service has been directed to protect the "fundamental purposes" of the Mall and of the other parks and monuments within the National Capital Region. To this end, it has promulgated regulations governing their use. *See* 36 C.F.R. § 7.96 (1994). These provide, in part, that "[d]emonstrations and special events may be held only pursuant to a permit issued in accordance with [its provisions]." *Id.* at § 7.96(g)(2). They also prohibit "[s]oliciting or demanding gifts, money, goods or services" in any of the parks. *Id.* at § 7.96(a) & (h) (1994). With respect to sales, at the time the district court issued its injunction in this case, section 7.96(k) of the regulations provided:

(1) No sales shall be made ... and no article may be exposed for sale without a permit except as noted in the following paragraphs.

(2) The sale or distribution of newspapers, leaflets, and pamphlets, conducted without the aid of stands or structures, is allowed in all park areas open to the general public without a permit except [certain areas not relevant here]. . . .

36 C.F.R. § 7.96(k) (1994).

Pursuant to an informal "enforcement guideline" adopted by the Park Service, demonstration and special event permittees were provided with a sheet of "additional conditions of permit" which informed them that, in addition to books, newspapers, periodicals, and pamphlets, they would be allowed to sell bumper stickers, buttons, posters, and T-shirts so long as those items "have a message relative to your cause/activity." The guideline also contained a noninclusive list of "those items most commonly offered erroneously for sale," which included jewelry, hats, coffee mugs, and "records/tapes."

In May 1994, the Park Service published a notice in which it sought comments on a proposed amendment to the sales regulation. *See National Capital Region Parks; Sales,* 59 Fed.Reg. 25,855 (1994) ("Notice of Proposed Rule"). In it, the Service stated that after ten years of experience, it had concluded that the guideline had adversely affected the National Capital Region Parks. Specifically, it determined

that the display and sale of bumper stickers, buttons, posters and T-shirts, ... irrespective of the message presented, ha[d] brought discordant and excessive commercialism, as well as degraded aesthetic values, ... and ha[d] ... den[ied] visitors the variety of opportunities to safely enjoy park resources.

*Id.* at 25,857.

Since oral argument, the Park Service issued its final rule amending the sales regulation and rescinded the enforcement guideline. The revised regulation now limits the exemption from the Service's general prohibition on the sale of merchandise within the National Capital Region parks to books, newspapers, leaflets, pamphlets, bumper stickers, and buttons. *See National Capital Region Parks; Special Regulations,* 60 Fed.Reg. 17,-639, 17,649 (1995) (to be codified at 36 C.F.R. § 7.96(k)(2)). The new rule thus continues to allow the sale of certain printed materials, such as books and buttons, while prohibiting the sale of all other articles, including audio tapes, that may carry a message. The new rule, however, moots one of ISKCON's less compelling arguments; namely, that because the enforcement guideline had not been adopted in a formal rulemaking, it was subject to a kind of arbitrary application that is inconsistent with a valid "time, place, and manner" restriction on speech.

B. Factual History

In May 1989, ISKCON obtained a Park Service permit to conduct a "Krishnafest" on the Mall in an approximately 100 square-foot area directly across from the National Air and Space Museum. According to ISKCON, a Krishnafest

entails public singing of Krishna conscious prayers and songs, discussing Krishna con-

sciousness with interested persons, distributing religious literature, audio cassette tapes, and religious beads to interested persons, and soliciting voluntary contributions from the general public.

Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue at 7. ISKCON asserts that a basic tenet of Krishna Consciousness requires its adherents to engage in "sankirtan," which means "to venture into public places for the purpose of spreading religious truth, proselytizing and attracting new members, and raising funds to support their religious activities." *Id.* at 5. ISKCON contends that the sale of audio tapes and religious beads and the solicitation of contributions from the public are important aspects of sankirtan. ISKCON's initial permit, which authorized a twenty-one day program, was routinely renewed with only minor modifications until March 26, 1991, when it was revoked after a Park Service Police Officer determined that the group was offering beads, audio tapes, and incense for sale.

C. Procedural History

The day after the Park Service revoked ISKCON's permit, ISKCON asked the Service to reconsider that decision. Subsequently, ISKCON sought relief from the Office of the Solicitor, United States Department of the Interior. After these efforts proved unavailing, ISKCON and its community outreach director, George Levinton (collectively, "ISKCON") brought this action requesting a declaration that the Park Service's regulations governing solicitations and sales were unconstitutional and an order enjoining the Park Service from enforcing those regulations. The parties agreed to resolve the case through cross-motions for summary judgment and, on August 6, 1993, the district court granted ISKCON's motion and entered an order enjoining the Park Service and its "agents and employees ... from enforcing sections 7.96(h) and [ (k) ] ... in the area of the Mall adjacent to the Air and Space Museum." *ISKCON of Potomac, Inc. v. Ridenour,* 830 F.Supp. 1, 5 (D.D.C. 1993). With the consent of the parties, the court subsequently amended its order, narrowing its scope "to plaintiffs' activities with

respect to sankirtan, and the sale of beads and audio tapes." *ISKCON of Potomac, Inc. v. Kennedy,* No. Civ. A. 92–1092, slip op. at 2 (D.D.C. June 26, 1995).

## II. DISCUSSION

ISKCON asserts that, as applied to its activities, the Park Service's solicitation and sales regulations violate both the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb (Supp. V 1993), which was enacted after the district court's decision. At oral argument, however, counsel for ISKCON withdrew its RFRA claim without prejudice.

█ Because the First Amendment's Free Exercise Clause does not protect ISKCON's activities from valid and neutral regulations of general applicability, *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990), we focus our inquiry on whether the application of the solicitation and sales regulations to ISKCON's conduct violated its rights under the Amendment's Free Speech Clause. We review the district court's decision to grant ISKCON's motion for summary judgment *de novo. Association of Flight Attendants, AFL–CIO v. USAir, Inc.,* 24 F.3d 1432, 1436 (D.C.Cir.1994).

█ We begin our analysis by observing that "the solicitation of charitable contributions is protected speech," *Riley v. National Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 789, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988), a proposition that the Park Service does not contest. *Cf. International Soc'y for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (*"Lee"*) ("It is uncontested that the solicitation at issue in this case is a form of speech protected under the First Amendment."). Similarly, expressive materials do not lose their First Amendment protection merely because they are offered for sale. *See, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) ("Speech ... is protected even though it is carried in a

form that is 'sold' for profit....") (citing cases). Indeed, the Court long ago reminded us "that the pamphlets of Thomas Paine were not distributed free of charge." *Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943).

■ Whether all of the items ISKCON offered for sale—or, as ISKCON characterized it, disseminated by sale or donation—are sufficiently expressive to trigger heightened review under the First Amendment presents a closer question. With respect to ISKCON's audio tapes, we note that these may serve as media of communication. When played, they transmit a message to the listener. The record before us establishes that ISKCON's audio tapes record prayers, devotional songs, and the chanting of the sect's names for God. As such, the tapes give expression to ISKCON's religious beliefs and teachings in a musical form. Accordingly, we hold that the sale of its audio tapes is protected under the First Amendment. *Cf. Gaudiya Vaishnava Soc'y v. City and County of San Francisco,* 952 F.2d 1059, 1064 (9th Cir.1990) (sale of merchandise in conjunction with other activities to disseminate organization's message is fully protected speech). Because we hold that ISKCON's audio tapes are protected and because we conclude, in part II.B.2. below, that the Park Service's sales regulation is constitutional even as applied to those tapes, we need not decide whether ISKCON's beads are also sufficiently expressive to merit First Amendment protection.

■ As at least some of ISKCON's conduct is protected, we must determine whether the Park Service's solicitation and sales regulations are permissible under the First Amendment. The parties have narrowed the scope of our inquiry. The Park Service concedes, as it must, that the Mall is a traditional public forum for purposes of the First Amendment. For its part, ISKCON recognizes that, even in a public forum, if the regulations are deemed content neutral, "this inquiry reduces to whether the requirements 'are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the [regulated] information.'" *Amer-*

*ican Library Ass'n v. Reno,* 33 F.3d 78, 88 (D.C.Cir.1994) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). While ISKCON agrees that the Government has a significant interest in preserving the purposes and values served by the Mall, particularly its role as a public forum, it contends that the restrictions imposed by the Park Service on its speech are neither content neutral nor narrowly tailored to serve those interests and that alternative channels for the communication of its message do not exist. We now address each of these contentions.

## A. Content–Neutral

### 1. Solicitation regulation

■ As noted above, the Park Service's solicitation regulation provides, in pertinent part, that "[s]oliciting or demanding gifts, money, goods or services [in the National Capital Region parks] is prohibited." 36 C.F.R. § 7.96(a) & (h). ISKCON argues that the solicitation regulation is content based because it bans speech that communicates a specific message—a request for money—and because the Park Service's purpose is to protect park visitors from this potentially unsettling or annoying message. Similarly, relying on *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983), ISKCON contends that the regulation cannot be characterized as a time, place, and manner restriction because it imposes a total prohibition on a particular type of expression.

■ These arguments are easily dismissed. Although the solicitation regulation could be read to prohibit all requests for donations, the Park Service has rejected this interpretation. Instead, it construes "solicitation" to include only an in-person request for immediate payment. Thus, according to the Park Service, ISKCON's representatives may distribute leaflets soliciting donations with instructions about where to send them. As we accord controlling weight to an agency's construction of its own regulations unless that construction "is plainly erroneous or inconsistent with the regulation," *United*

*States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (internal quotation marks omitted), we accept the Park Service's interpretation of section 7.96(h) as applying only to the in-person solicitation of immediate donations. *Cf. Lewis v. Babbitt,* 998 F.2d 880, 882 (10th Cir.1993) (noting that court owed "great deference" to the Park Service's interpretation of its own regulations). So construed, the solicitation regulation does not, as ISKCON contends, totally prohibit a type of expression or a specific message; rather, it merely regulates the manner in which the message may be conveyed. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2721 (Kennedy, J., concurring in the judgment) (regulation prohibiting in-person solicitation for immediate payment regulates the manner but not the content of expression). Accordingly, we reject ISKCON's contention that the solicitation regulation is content based.

### 2. Sales regulation

■ The Park Service's amended sales regulation provides:

> No merchandise may be sold during the conduct of special events or demonstrations except for books, newspapers, leaflets, pamphlets, buttons and bumper stickers. A permit is required for the sale or distribution of permitted merchandise when done with the aid of a stand or structure....

*Special Regulations,* 60 Fed.Reg. at 17,649. Although the regulation limits the means by which a message may be expressed (*i.e.,* through the sale of books and buttons but not through the sale of audio tapes or beads), it is not concerned with the content of the message conveyed by the items in question. Accordingly, we hold that it is content neutral. *See Ward,* 491 U.S. at 791, 109 S.Ct. at 2753 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some ... messages but not others."); *Bamon Corp. v. City of Dayton,* 923 F.2d 470, 473 (6th Cir.1991) (regulations applicable to particular category of speech "properly characterized as content-neutral,

as long as the regulations are justified without reference to the content of that speech").

### B. Narrowly Tailored

As the solicitation and sales regulations are content neutral, we will uphold them as valid time, place, and manner restrictions so long as they are "narrowly drawn to serve a significant governmental interest" and "leave open ample alternative channels for communication" of the message. *Clark Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221. For the purposes of this analysis, "a narrowly tailored regulation 'need not be the least restrictive or least intrusive means' of serving the government's content-neutral interests." *American Library Ass'n,* 33 F.3d at 88 (quoting *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757). The restriction, however, may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758.

### 1. Solicitation regulation

■ The Park Service argues generally that its prohibition of in-person solicitation is intended to preserve the quality of experience provided by the Mall and the other parks in the National Capital Region. The Service contends that, were solicitation permitted, hordes of solicitors would swarm through the parks pestering visitors with requests for donations. As a consequence, their aesthetic value would be diminished; and visitors, harassed and pursued by solicitors, would be precluded from enjoying the parks and their resources.

The Park Service calls our attention to the fact that the Supreme Court recently recognized that solicitation is a more intimidating and disruptive form of expression than leafletting (citing *Lee,* —— U.S. at ——, 112 S.Ct. at 2708, and *United States v. Kokinda,* 497 U.S. 720, 734, 110 S.Ct. 3115, 3123, 111 L.Ed.2d 571 (1990)). We note the Court's observations regarding the intrusiveness of solicitation. The cases on which the Service relies, however, do not address solicitations in a public forum. *Lee,* —— U.S. at ——, 112 S.Ct. at 2708 (concluding that airport termi-

nals were not public fora); *Kokinda*, 497 U.S. at 730, 110 S.Ct. at 3121 ("the regulation at issue must be analyzed under the standards set forth for nonpublic fora...."). Neither we nor ISKCON quarrel with the Park Service's goal of preserving the National Capital Region parks from the ills associated with runaway solicitation. Nonetheless, as applied here, the ban on the in-person solicitation of immediate donations will not survive constitutional scrutiny.

Nothing in the record suggests that ISKCON solicited donations on portions of the Mall outside its well-delineated 100–square–foot permit area. We fail to see how solicitations made by members of ISKCON operating within so restricted an area can possibly hurt the values the Park Service legitimately seeks to protect. The conduct of a special event within a small, well-defined permit area will have some effect on the ambiance of the Mall. But we cannot see how allowing in-person solicitations within the permit area will add to whatever adverse impact will result from the special event itself. The effects of solicitation will be confined to the permit area, and those who wish to escape them may simply steer clear of the authorized demonstration or special event. As ISKCON notes, "Mall visitors can simply walk around the Krishnafest area." Brief for Appellees at 37.

The Park Service observes quite correctly that if ISKCON is permitted to solicit donations within its permit area, then so too may others who are similarly situated. So be it. Our holding allows only those individuals or groups participating in an authorized demonstration or special event to solicit donations within the confines of a restricted permit area such as that assigned to ISKCON. It does not require the Park Service to let rampant panhandling go unchecked. Accordingly, we conclude that, as here applied, the solicitation regulation burdens substantially more speech than necessary and violates the Free Speech Clause of the First Amendment.

*2. Sales regulation*

■ ISKCON argues, essentially, that the sales regulation is not narrowly tailored be-cause the Park Service has failed to provide an adequate explanation of why it permits the sale of books and bumper stickers on the Mall while denying it the right to sell audio tapes and beads that have comparable expressive values. ISKCON's position has an undeniable appeal. On first impression, it does seem anomalous that the Park Service should have allowed ISKCON to sell a bumper sticker having a message relative to its cause or activity while at the same time denying it the right to sell an audio tape that might give its message both content and depth. But the logic of ISKCON's position would require the Park Service to ban the sale of all expressive articles or none, a proposition that on its face is equally anomalous. What we are dealing with here is an underinclusive regulation; and as the Supreme Court has observed, it is "surprising at first glance ... that a regulation of speech [should ever be found] impermissibly *underinclusive*...." *City of Ladue v. Gilleo*, —— U.S. ——, ——, 114 S.Ct. 2038, 2043, 129 L.Ed.2d 36 (1994) (emphasis in original). *Cf. Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) (noting that content-neutral, underinclusive classifications of speech are presumed valid); *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 386–87, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992) (First Amendment "imposes not an underinclusive limitation but a content discrimination limitation") (internal quotation marks omitted).

The Court points to two circumstances in which an underinclusive regulation will be found impermissible. The first is when "an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *Gilleo*, —— U.S. at ——, 114 S.Ct. at 2043 (internal quotation marks and citation omitted). The other involves "[e]xemptions from an otherwise legitimate regulation of a medium of speech ... [that] may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at ——, 114 S.Ct. at 2044 (citing *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, ——–——,

113 S.Ct. 1505, 1511–15, 123 L.Ed.2d 99 (1993)).

■ Based on our reading of *Gilleo* and the other Supreme Court cases cited above, we conclude that an underinclusive time, place, and manner regulation that is otherwise valid must be found to be constitutional so long as it does not favor one side of an issue and its rationale is not undermined by its exemptions. *Cf. Moser v. FCC*, 46 F.3d 970, 974 (9th Cir.1995) (holding that an underinclusive regulation will violate the First Amendment only if it favors a particular viewpoint). The sales regulation meets both of these tests. No one can seriously claim that its exemptions tip the balance of any debate. Nor do they diminish the credibility of the Service's reasons for its general prohibition of sales in the National Capital Region parks.

The Service is charged with maintaining the integrity of the Mall and the other parks in the National Capital Region. This is an enormous task. The number of visitors has grown dramatically over the years as have the numbers of demonstrations and special events that have taken place in the parks. In its Notice of Proposed Rule, the Service estimated that, in 1994, it would issue permits for approximately 3,500 demonstrations and special events. 59 Fed.Reg. 25,857. A large number of these permits would authorize the sale and distribution of exempted materials. *Id.* The Park Service's general ban on sales is intended, of course, to keep such activities within tolerable limits; and as its experience with T-shirts has demonstrated, an exemption from the ban can result in an "unsightly, inappropriate and an unwelcome commercial intrusion." *Id.* It seems self-evident that the addition of any new article to the list of exemptions must increase in some degree the commercial activity that will take place in the parks.

Based on the record before us, we conclude that limiting the exemptions to the items listed does not diminish the credibility of the Park Service's rationale for prohibiting the sale of other articles. This case is not like *Discovery Network.* There, the Supreme Court found invalid a municipal ordinance that prohibited the distribution of commercial handbills through the use of newsracks while permitting them to be used for the dispensing of newspapers. The city argued that the ordinance was a reasonable content-neutral time, place, or manner restriction that was designed to improve the attractiveness of the cityscape by removing a source of visual blight. *Id.* at —— – ——, 113 S.Ct. at 1510–11. The Court found the argument "unpersuasive because the very basis for the regulation [was] the difference in content between ordinary newspapers and commercial speech." *Id.* at ——, 113 S.Ct. at 1516. It also found that the city's rationale for restricting the commercial speech lacked credibility because the ordinance's distinction between commercial and noncommercial speech bore no relationship to the aesthetic interests that the city had asserted. *Id.* at ——, 113 S.Ct. at 1514. The law resulted in the removal of only 62 of the more than 1,500 newsracks in Cincinnati, *id.* at ——, 113 S.Ct. at 1510; and, as the Court noted, a rack dispensing a newspaper is no more comely than one dispensing commercial materials. *Id.* at ——, 113 S.Ct. at 1515.

Here, of course, we are dealing with a content-neutral regulation, not one that is directed at commercial speech. Moreover, the sales regulation has served its purpose. Although the Park Service has exempted certain articles from the general ban on sales, the Mall is essentially free of commercialism. Thus, in contrast with the Cincinnati ordinance, the regulation's underinclusiveness does not undermine its rationale. We conclude, then, that so long as exemptions from the ban do not have the effect of favoring a particular view, the Service is at liberty to determine how much commercial activity may be permitted on the Mall and the other parks in the National Capital area without significant erosion of their fundamental purposes. As the Supreme Court has observed:

> The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.

*United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985).

A sales regulation does not become less narrowly tailored merely because the Service has concluded that the sale of some expressive materials may be permitted without the sacrifice of essential park values. The exemption of some speech does not require the exemption of all speech. *See Moser,* 46 F.3d at 974 (upholding statute prohibiting automated, but permitting "live," telemarketing calls); *Ater v. Armstrong,* 961 F.2d 1224, 1229–30 & n. 5 (6th Cir.1992) (upholding statute prohibiting leafleting, but permitting solicitation of contributions, along roadways). We conclude, therefore, that the sales regulation is not "substantially broader than necessary to achieve the government's interest." *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758.

### 3. *Ample alternative channels*

As we hold that the solicitation regulation is not narrowly tailored, we need not reach the question of whether it leaves open ample alternative channels of communication. We must decide, however, whether the sales regulation, which we find to be both content-neutral and narrowly tailored, leaves open ample alternative channels for the communication of ISKCON's message. We conclude that it does.

Under the sales regulation, ISKCON may convey information about the Krishna Consciousness faith in innumerable ways. For example, ISKCON may resort to any of the traditional print media allowed to be sold in the park areas. In addition, nothing in the sales regulation prevents ISKCON's members from speaking to interested park visitors; nor are they precluded from singing and chanting Krishna Consciousness music and prayers. In fact, as the Park Service stresses, ISKCON's members may display and give the audio tapes and beads to members of the public so long as they do not try to exact a payment or request a donation in exchange for them.

In light of these adequate substitutes for the sale of audio tapes and beads, ISKCON's reliance on *Linmark Assocs., Inc. v. Willingboro,* 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977), is misplaced. There, the Supreme Court observed that a local ordi-nance banning real estate "For Sale" signs relegated sellers to alternative means of communication that involved "more cost and less autonomy than 'For Sale' signs" and that were "less likely to reach persons not deliberately seeking sales information...." *Id.* Similarly, in *Gilleo,* the Court held that a city ordinance prohibiting homeowners from displaying certain signs on their property did not leave open ample alternative channels for communication:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location such signs provide information about the identity of the "speaker."

*Gilleo,* —— U.S. at ——, 114 S.Ct. at 2046. As we have indicated above, however, members of ISKCON have adequate substitutes for the sale of their audio tapes and beads. Resort to these alternatives would not infringe on the autonomy of the group's members, make it less likely that they would reach their intended audience, or prevent them from revealing their identity or advocating their cause.

Nevertheless, ISKCON contends that, because its audio tapes and beads serve unique, instrumental roles in the Krishna Consciousness faith, any alternative would prove unsatisfactory. This argument, however, conflates ISKCON's Free Speech claim with the religious freedom claim that it abandoned at oral argument. The Supreme Court has instructed that under the Free Speech clause "religious organizations [do not] enjoy rights to communicate ... superior to those of other organizations having social, political, or other ideological messages to proselytize." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 652–53, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981). Because ISKCON may express its message in countless ways that are consistent with the sales regulation, and because we find these alternatives to be more than adequate, we hold that the Park Service's sales regulation leaves open ample alternative channels for communication.

As the sales regulation is also content neutral and narrowly tailored to serve significant governmental interests, we hold that its application to ISKCON's sale of audio tapes and beads is permissible under the First Amendment.

### III. CONCLUSION

We hold that the Park Service's application of the solicitation regulation to ISKCON's requests for voluntary donations within the permit area violated the Free Speech Clause of the First Amendment. We conclude, however, that the Park Service's prohibition of the sale of audio tapes and beads is permissible. Accordingly, we affirm in part and reverse in part.

*It is so ordered.*

GINSBURG, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion of the Court insofar as it holds the Park Service solicitation regulation unconstitutional as applied to ISKCON's activities. Insofar as the Court holds that the Park Service may prohibit ISKCON from selling audio tapes and certain beads, however, I dissent.

### I. Audio Tapes

The Park Service allows demonstrators on the Mall to sell books, newspapers, leaflets, pamphlets, buttons, and bumper stickers that have a message relevant to their cause. At the same time it refuses to allow demonstrators to sell audio tapes with like content lest a large number of vendors flock to the Mall, resulting in a level of commercial activity "inconsistent with the Park Service's statutory mandate to preserve and maintain the parks."

As the Court notes (at 953–54), ISKCON's sale of tape recordings of prayers, songs, and chants clearly implicates the First Amendment, especially on the Mall—the quintessential public forum in the civic life of the nation. Nevertheless, as the Court also notes (at 954–55), the sales regulation is content neutral and may therefore be upheld as a legitimate restriction upon the time, place, or manner of speaking if the Park Service

shows that the regulation is "narrowly drawn to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of the information." *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 & n. 5, 104 S.Ct. 3065, 3069, & n. 5 (1984).

The Park Service's interest in limiting commercial activity and thereby maintaining the unique aesthetic character of the Mall is undoubtedly significant; the disputed question here is whether its prohibition upon the sale of audio tapes is narrowly drawn to serve that interest, which turns upon the "fit" between the end being sought and the means chosen to accomplish it. *See Board of Trustees, State University of New York v. Fox,* 492 U.S. 469, 477–80, 109 S.Ct. 3028, 3033–35, 106 L.Ed.2d 388 (1989); *see also Riley v. National Federation of the Blind of North Carolina,* 487 U.S. 781, 795–96, 108 S.Ct. 2667, 2676–77, 101 L.Ed.2d 669 (1988) (commercial element to protected speech does not justify greater regulation). The fit need "not necessarily [be] perfect, but [it must be] reasonable; ... not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 480, 109 S.Ct. at 3035; *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 12, 113 S.Ct. 1505, 1510 n. 12, 123 L.Ed.2d 99 (1993). Moreover, the Government bears the burden of showing that the regulation is "narrowly tailored." *See Fox,* 492 U.S. at 480, 109 S.Ct. at 3035; *Discovery Network,* —— U.S. at —— n. 12, 113 S.Ct. at 1510 n. 12; *see also United States v. Doe,* 968 F.2d 86, 90 (D.C.Cir.1992).

In most cases, a content-neutral regulation of speech is not invalid simply because it is underinclusive—i.e., fails to restrict all of the activity that infringes upon the end that the Government seeks. *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) ("Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it"). Nevertheless, as the Supreme Court has noted:

Exemptions from an otherwise legitimate regulation of a medium of speech may be

noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: they may diminish the credibility of the government's rationale for restricting speech in the first place.

*City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2044, 129 L.Ed.2d 36 (1994) (citing *Discovery Network,* —— U.S. at —— - ——, 113 S.Ct. at 1511–15). In my opinion, the Park Service's decision to ban the sale of audio tapes while it allows the sale of books diminishes to the vanishing point the credibility of its purported rationale.

Throughout this case the Park Service has presented but one explanation for its decision to prohibit the sale of audio tapes while allowing the sale of other expressive articles: By limiting the types of articles to be sold, the regulation effectively limits the number of vendors on the Mall, thereby reducing the "visual clutter," "trash and debris," "congestion," and "degradation of the park[ ] atmosphere." In short, the Park Service claims that by permitting fewer sales, the rule helps preserve the aesthetic quality of the Mall. That may be true, but the Supreme Court has specifically held that rationale insufficient to support an underinclusive regulation of protected speech in a public forum.

*Discovery Network* involved a Cincinnati ordinance that prohibited the placement upon public property of newsracks containing commercial handbills—but not of newsracks containing newspapers—on the ground that the regulation advanced the city's interest in preserving the attractiveness of the streets by reducing the total number of newsracks. The Court rejected that argument because the distinction drawn by the statute bore "no relationship *whatsoever* to the particular interests ... asserted." *Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1514 (emphasis in original). The Court explained:

> [T]he city's primary concern, as argued to us, is with the aggregate number of newsracks on its streets. On that score, however, all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault.

*Id.* at ——, 113 S.Ct. at 1515. The Court went on to hold that the ordinance was not a content-neutral regulation. *Id.* at —— -

——, 113 S.Ct. at 1516–17. Contrary to the opinion of the Court in this case (at 956–58), however, the presence in *Discovery Network* of that "alternative rationale for invalidating the city's policy," *id.* at ——, 113 S.Ct. at 1524 (Rehnquist, C.J., dissenting), does not mean that every underinclusive regulation is permissible so long as it is content neutral. On the contrary, as the Supreme Court reiterated in *Gilleo,* the Government's failure adequately to justify an underinclusive regulation still renders it impermissible "quite apart from the risks of viewpoint or content discrimination." —— U.S. at ——, 114 S.Ct. at 2044.

Just as certain newsracks in *Discovery Network* were no more responsible than others for the city's visual blight, in this case audio tapes are no more at fault than books, buttons, or bumper stickers for commercialism on the Mall. The Park Service has offered no argument, nor even hinted at any evidence, suggesting why tapes should be prohibited while books are allowed; indeed, the Park Service's stated rationale, if accepted, would equally support the opposite rule, i.e., a ban on books but not tapes. And for all we know, such a rule would be equally effective in keeping the Mall "essentially free of commercialism." *Ct.Op.* at 957.

In its quest to limit commercial activity on the Mall the Park Service may be able constitutionally to prohibit sales with little or no expressive value, or to prohibit activity that *is* expressive but has a particularly disruptive impact; it may even be able to rule out entirely some protected speech so long as it does so by wholly neutral means (e.g., a lottery); but it may not limit protected speech capriciously. That is precisely what it has done here by allowing ISKCON to sell books but not tapes without saying why, in its judgment, the sale of tapes is more inimical to the preservation of the Mall. There may be valid reasons for the Park Service to distinguish tapes from books, but the simple fact that prohibiting tapes reduces the amount of commercial activity on the Mall to a more acceptable level is not one of them.

Though the Park Service, not the court, is charged with determining how best to conserve the Mall, *see Community for Creative*

*Non–Violence,* 468 U.S. at 299, 104 S.Ct. at 3072, "[w]here constitutionally protected activity is implicated, we cannot simply defer to the Park Service's unexplained judgment." *Doe,* 968 F.2d at 90. Therefore, I would hold that the Park Service's failure adequately to explain the distinction it has drawn proves fatal to its regulation as applied in this case.

## II. Beads

ISKCON also wants to go on selling two types of beads at its stand on the Mall. One type apparently serves as an instrument of prayer and meditation while the other serves to identify the wearer as a devotee of Krishna. ISKCON's sale of the former is of no moment to the First Amendment; those beads may be an aid to spiritual activity, but they are not in themselves communicative. I presume that the Park Service could not prohibit the use of a rosary or perhaps of a prayer mat on the Mall, but that does not mean that it must also allow vendors to sell them there. *See There to Care, Inc. v. Commissioner of Indiana Department of Revenue,* 19 F.3d 1165, 1167 (7th Cir.1994) (holding words used in bingo game not protected because they did "not convey ideas").

The so-called identification beads, on the other hand, must be considered communicative in light of ISKCON's assertions, the Park Service's stipulations, and the procedural posture of this case. These beads seem to serve the same function for the wearer as does a lapel button or a bumper sticker. The ban on the sale of such beads therefore suffers from the same flaw, and should share the same fate, as the (thus far) unjustified ban upon the sale of audio tapes. I believe there are two distinctions worth noting, though.

First, a string of religious identification beads may be practically indistinguishable from the much larger class of decorative beads that are not communicative in any meaningful sense. Whereas an audio tape necessarily contains some information or expression, it is only the exceptional strand of beads that makes anything but a fashion statement. Therefore, the Park Service may be able to justify a flat prohibition upon the sale of jewelry based simply upon the administrative difficulty of sorting the speaking beads from the mute.

Second, ISKCON's beads—like bumper stickers and T-shirts—may be communicative, but their sale does not add anything to ISKCON's ability to communicate its ideas to passers-by on the Mall. Whereas a book, a tape, a newspaper, or a handbill is a convenient way of communicating more information than can be relayed on sandwich boards or by engaging a stranger in conversation, the message printed on a bumper sticker or a T-shirt or symbolized by a strand of beads is just as well communicated by its display as by its sale. In reality, the beads are of value as a medium of communication not primarily to ISKCON but to the purchaser who will use them to communicate to others. But while wearing a string of beads may be protected activity, *see Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), no first amendment principle makes the right to buy them coextensive with the right to display them.

Unfortunately, the Park Service rests its prohibition of the sale of beads not upon either of these grounds but upon the same rationale that it gives for not allowing the sale of audio tapes—claiming the authority to limit the number of transactions on the Mall in any content-neutral way it sees fit. Clearly enough the Park Service must draw the line somewhere if the Mall is not to be turned into a flea market; and perhaps the line it has drawn at the sale of beads is as good a line as any. Indeed, this may be an area in which any line must be substantively arbitrary—distinguishing among things that play indistinguishable roles in the expression of ideas—so that administrative convenience may be allowed to govern. But the Park Service has given the court no particular reason to think that is the case, and we may not supply one for it. *See Doe,* 968 F.2d at 90.

## III. Conclusion

For the foregoing reasons, I respectfully dissent from the opinion of the Court insofar as it upholds the application of the Park

Service sales regulation to the audio tapes and the identification beads involved in this case.