# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

February 19, 2003

**Before**

Hon. William J. Bauer, *Circuit Judge*
Hon. Ilana Diamond Rovner, *Circuit Judge*
Hon. Ann Claire Williams, *Circuit Judge*

No. 02-1372

MARK G. WEINBERG,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1139—**Arlander Keys**, *Magistrate Judge.*

———————

## O R D E R

On December 4, 2002, defendant-appellee filed a petition for rehearing *en banc* and on December 19, 2002, plaintiff-appellant filed an answer, and on December 26, 2002, defendant-appellee filed a reply in support of the petition for rehearing. A vote of the panel and active members of the court was requested, and a majority of the judges voted to deny the petition for rehearing *en banc*.

Judge Easterbrook dissented in an opinion joined by Judges Coffey and Manion, which follows. Judge Ripple voted to grant rehearing *en banc* but did not join in the dissent.

The petition for rehearing *en banc* is therefore DENIED.

EASTERBROOK, *Circuit Judge*, with whom COFFEY and MANION, *Circuit Judges*, join, dissenting from the denial of rehearing en banc. This case presents the question whether the first amendment (applied to the states by the fourteenth) requires state and local governments to make speech exceptions to laws regulating conduct—here, the sale of merchandise. The panel answered yes, see *Weinberg v. Chicago*, 310 F.3d 1029 (7th Cir. 2002), without trying to reconcile its view with contrary decisions of the Supreme Court. Nor did the panel recognize that it was going into conflict with other circuits that have rejected materially identical arguments. Whether governments must make speech exceptions to neutral statutes is an important and recurring question, here and in other circuits, as people seek to put public spaces to private ends. See, e.g., *Thomas v. Chicago Park District*, 534 U.S. 316 (2002); *Graff v. Chicago*, 9 F.3d 1309 (7th Cir. 1993) (en banc). Before dropping this into the Supreme Court's lap, we ought to take a second look at the issue.

An ordinance forbids all peddling on public property within 1,000 feet of United Center, where the Chicago Bulls and Chicago Blackhawks play their home games.[1] United Center is in a high-density residential area, and congestion

---

[1] "No person shall peddle merchandise of any type on any portion of the public way within 1,000 feet of the United Center. A person holding a valid peddler's license may peddle merchandise while on private property within 1,000 feet of the United Center only from a cart, table or temporary stand on private property without obstructing the public way, and pursuant to prior written permission from the property owner to do so. The provisions of this section shall be in addition to any other limitation on or regulation of peddlers. Any person who violates any provision of this section shall be fined not less than $200.00 nor more than $500.00 for each offense, and each day such violation shall continue shall be deemed a separate offense." Chicago Municipal Code §4-244-147.

becomes acute when crowds of 20,000 or more converge at game time. The district court found it undisputed that congestion used to be a serious problem, which the 1,000-foot rule relieved.[2] Our panel did not say that there is a material dispute that must be resolved at trial but dismissed the City's evidence out of hand as "self-serving" (310 F.3d at 1038) and held the ordinance unconstitutional as a matter of law because it does not make an exception for books.

Why can't peddling-control ordinances cover sales of literature? Economic laws of general application are valid

---

[2] "Officer John Walls testified at his deposition that, prior to the enactment of the peddlers' ordinance, peddlers slowed up and even stopped traffic, even though all peddlers were required to be 'mobile.' 'For years I have been asking to have all the vendors removed to the other side of the street because you can't have vendors out there when you're trying to get 22,000 people or 24,000 people into a Bulls game, because everyone of them disrupts and causes problems' with regard to traffic congestion and pedestrian safety. Specifically referencing Plaintiff's activities, Officer Walls stated that Plaintiff frequently gathered crowds of six to eight people, and that '[w]hen you have a crowd of six people eight people standing at the mouth of the sidewalk, these people have to go outside that protected area in order to get around or—and even if they're just walking around four or five people in a sidewalk—I mean outside the sidewalk on the street, to me that's obstructing.' Officer Walls also testified that the peddlers' ordinance 'helped immensely' and greatly reduced the congestion around the United Center, stating that when 'we were able to move [the peddlers] away, it opened up traffic to where it was like a difference on night and day. We didn't even realize how much of a problem we had because it was there all the time. As we moved the vendors away, we were able to—we actually could use less officers in certain areas and put them into the main crosswalks and everything became more orderly.'" *Weinberg v. Chicago*, 179 F. Supp. 2d 869, 876 (N.D. Ill. 2002) (footnote and citations to the record omitted).

if supported by any rational basis, and the government receives the benefit of all plausible inferences. Legislative choices are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). This ordinance faces no problem under that standard, and the panel soundly rejected a contention that the law's exception for newspapers makes it improper to curtail other peddling. 310 F.3d at 1035-36. Chicago's rule is a good deal more sensible than the exception-ridden peddling-control ordinance held constitutional in *New Orleans v. Dukes*, 427 U.S. 297 (1976). Our panel nonetheless assumed that the rules about time, place, and manner restrictions on speech apply to anti-peddling laws as applied to writings, and that the government thus must show that it has regulated with the lightest possible touch. Yet the City's ordinance does not single out the spoken or written word. It covers peanuts, beer, ice cream, hockey pucks, noisemakers, team jerseys, bobblehead dolls of Michael Jordan, and anything else that vendors may want to sell near a stadium. It forbids selling a hagiography of Bobby Hull or an autographed team picture, just as it forbids selling a denunciation of Arthur Wirtz or a can of Coca Cola.

Whether laws regulating conduct must except expressive activities is an old question, with an established answer: no. Governments may collect sales taxes on all retail transactions, including written, recorded, and broadcast speech, see *Leathers v. Medlock*, 499 U.S. 439 (1991) (holding that this is so even if some media are exempted); Borders must locate its bookstores and Blockbuster its video outlets in areas zoned for shops rather than homes; AOL Time Warner must pay federal income tax just like every other corporation, even though almost all of its gross receipts come from material protected by the first amendment. Ever since *United States v. O'Brien*, 391 U.S. 367

(1968), it has been understood that conduct regulation neutral with respect to a speaker's viewpoint may be enforced according to its terms. That principle covers Chicago's ordinance, which does not heap extra regulation on speech or speakers (contrast *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987)) or allow any viewpoint-based exception (does not, for example, exempt paeans to the Mayor). *O'Brien* has been understood to nix all sorts of constitutionally based requests to remove expressive activities from generally applicable statutes. See, e.g., *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (no leaflet-sale exception to regulation of all sales at a state fair); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) (*CCNV*) (no expressive-sleeping exception to rules banning camping in a public park); *Employment Division v. Smith*, 494 U.S. 872 (1990) (first amendment does not compel government to accommodate religiously motivated activities that violate neutral statutes regulating conduct); *Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (no expressive-dancing exception to prohibition of public nudity). True, none of these decisions involved books, but the first amendment does not distinguish between leaflets (one subject of *Heffron*) and books.

Other courts of appeals have used the *O'Brien* principle to hold that government need not allow the sale of expressive materials in public parks where selling souvenirs and other trinkets has been forbidden. See, e.g., *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001); *Friends of the Vietnam Veterans Memorial v. Kennedy*, 116 F.3d 495 (D.C. Cir. 1997); *One World One Family Now v. Honolulu*, 76 F.3d 1009 (9th Cir. 1996); *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949 (D.C. Cir. 1995). Once again none of these involved books: *ISKCON* dealt with religious audio tapes, *Vietnam Veterans* with T-shirts bearing political messages, *One World* with T-shirts conveying cultural slo-

gans, and *Henderson* with religiously oriented T-shirts. Once again this is immaterial. Audio tapes and expressive clothing receive the same protection as other speech. See *Cohen v. California*, 403 U.S. 15 (1971) (text-bearing jacket); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) (arm band implying a point of view). The first amendment applies to the message, not the medium. See, e.g., *Ayres v. Chicago*, 125 F.3d 1010 (7th Cir. 1997); *Chicago Acorn v. Metropolitan Pier & Exposition Authority*, 150 F.3d 695, 703 (7th Cir. 1998) (a "T-shirt could be considered a leaflet in another medium"). A neutral ban on sales treats books, T-shirts, and cotton candy alike; a constitutionally based exception for books must hold for T-shirts too, placing us in conflict with other circuits.

Our panel did not mention *Henderson* or *ISKCON*, although both were relied on by the district court and featured prominently in the appellate briefs. It did attempt to distinguish *One World* and *Vietnam Veterans*, on the ground that "the magnitude of the no-peddling zone eliminates the possibility that Weinberg could sell his book in proximity to the prohibited area, making reliance on these cases suspect." 310 F.3d at 1041 n.3. This assumes what is to be established—that a neutral no-sale ordinance should be treated as a time, place, and manner regulation of speech. It also is factually unsound. The prohibition in *Vietnam Veterans* covered the Mall in Washington, D.C., which contains considerably more space than the public ways within 1,000 feet of United Center; the prohibition in *One World* covered all "public streets, alleys, sidewalks, malls, parks, beaches and other public places in Waikiki." 76 F.3d at 1011. And Chicago's ordinance does not expel Weinberg from the 1,000 feet surrounding United Center. He may give away his book, buttonhole passers-by and ply them with broadsides, or deliver a harangue from a soapbox. He may sell the book from any private property in the zone. An owner could charge him

for the privilege, but any book seller must cover the expense of distribution: bookstores need to buy or rent their premises, while authors and publishers need to pay middlemen (including printers and bookstores) for essential services. The word "free" in the phrase "free speech" means "free of governmental meddling," not "free of cost."

If the ordinance really should be treated as a time, place, and manner rule, the panel's treatment of precedent from other circuits is not the only problem. Our panel assumed that the burden of making an exception is measured by how much disruption the plaintiff would cause, and it held that the City must permit book sales because Weinberg personally would not stir up much ruckus. It harped on the fact that Weinberg's book is critical of the Blackhawks' owner—as if the constitutionality of the ordinance depends on the plaintiff's viewpoint. Not so; either the law constitutionally may be applied to all literature sales, or it may be applied to none, and the author's angle does not matter. (Weinberg does not contend that this law was enacted to make it hard for him to sell his book.) The panel remarked: "The City of Chicago has provided no objective evidence that traffic flow on the sidewalk or street is disrupted when *Mr. Weinberg* sells *his* book. . . . The City also fails to explain why there were no disturbances or problems when *Weinberg* was selling *his* book during the period prior to enforcement of the ordinance or after the lower court granted the temporary restraining order." 310 F.3d at 1039 (emphasis added). This is not the right question. *Heffron* and *CCNV* reject any argument that the burden of making exceptions must be measured against the plaintiff's conduct standing alone. See, e.g., 452 U.S. at 652 ("[t]he justification for [a law] should not be measured by the disorder that would result from granting an exception solely to [the litigant]").

Given the panel's opinion, *anyone* may sell *any* expressive material (including T-shirts and "expressive souve-

nirs" such as team pennants) on public ways near United Center. Because commercial speech is protected by the first amendment, see *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), and *everything* offered for sale at a sports stadium includes some commercial speech, everything may be sold there as a result of the panel's opinion—including bags of pretzels bearing horoscopes and hot dogs served in paper trays emblazoned with slogans such as "All-beef franks are good for you!" or "Go Bulls!". Commercial speech may be regulated to curtail secondary effects, see *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980), but the panel has held that the secondary effects of peddling are not so bad (and, to repeat, the City has not tried to regulate *speech* at all, so this line of argument is unavailable to it). Thus the question on the table is the degree of congestion to be expected from the law's repeal; it is not limited to the hassles Weinberg will cause all by himself. Indeed, the precedential force of this opinion takes out similar laws that cover Soldier Field, Wrigley Field, Comiskey Park, and other sports venues—not only in Chicago but also throughout the circuit. Many of these, like United Center, are situated in residential neighborhoods where auto and pedestrian traffic come to a crawl on game days.

The panel gets no support from its observation that a videotape taken near United Center after this suit was filed "shows no interference with any pedestrian traffic nor any congestion along the sidewalk." 310 F.3d at 1038. This is another Weinberg-specific point: everyone else was obeying the law. As *Heffron* and *CCNV* hold, it just does not matter that Weinberg personally won't cause the sky to fall. What the tape principally demonstrates is that enforcement of the ordinance facilitates smooth traffic flow. Evidence that a statute works should not be confused with a demonstration that it serves no useful purpose.

(A tape of the vicinity at game time preceding the ordinance's enactment could permit a before-and-after comparison, but none is in the record.)

One final observation. Part IV of the panel's opinion, 310 F.3d at 1043-46, holds that the criteria for issuing peddling licenses are unconstitutionally vague. The City has not sought reconsideration of this issue, which is relevant only if the 1,000-foot rule fails. Doubtless the City plans to fix this problem legislatively or by regulation. Under the panel's analysis, however, the 1,000-foot rule is not reparable. The case thus presents an important and recurring issue, creates a conflict among the circuits, and depends on legal propositions that the Supreme Court does not approve. These considerations support rehearing en banc.

A true Copy:

        Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*