**Wendy Allen AYRES, Plaintiff–Appellee,**

v.

**CITY OF CHICAGO, Defendant–Appellant.**

**No. 97–2373.**

United States Court of Appeals, Seventh Circuit

Argued July 16, 1997.

Decided Sept. 4, 1997.

Edward T. Stein (argued), Mary Lou Boelcke, Karen E. Tamburro, Chicago, IL, for Plaintiff–Appellee.

Benna R. Solomon, Anita Modek–Truran (argued), Patricia T. Bergeson, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and EVANS, Circuit Judges.

POSNER, Chief Judge.

The City of Chicago appeals from the grant to the plaintiff, Wendy Ayres, of a preliminary injunction. The injunction forbids the City to invoke its "Peddlers' Ordinance" (Chi.Munic.Code ch. 4–244) to prevent Ayres from advocating the legalization of marijuana by selling T-shirts conveying her message at festivals such as the "Taste of Chicago" that the City sponsors in Grant Park. The ordinance forbids the peddling of any merchandise, except newspapers, on either public property (such as Grant Park) or (with immaterial exceptions, see §§ 4–244-145, 4–244-147) private property, in districts designated by the city council. §§ 4–244-140, 10–8–520. In 1994, the council designated much of downtown Chicago as a district (the "central district") closed to peddling. The central district covers the area lying between McCormick Place on the south and the Chicago River on the north, and between Lake Michigan on the east and Western Avenue on the west. Grant Park, where the festivals are held, is entirely within the central district, but the district also includes—as anyone familiar with Chicago will recognize from our description of the district's boundaries—a very wide buffer around the park to the north, south, and west.

The only exception in the ordinance itself to the ban on peddling is, as we have indicated, for the peddling of newspapers; but until recently the police took the position that the ordinance was also inapplicable to "persons who distribute or sell material containing political or religious ideas," an apt description of Ayres and her group, the "Marijuana Political Action Committee." The distribution of T-shirts is the principal means by which the group propagates its views, and the sale of T-shirts by the members is a, probably the, principal source of the group's modest revenues. In 1996, the City changed its policy and the police began ticketing Ayres for violation of the ordinance, precipitating this suit, which claims that the enforcement of the ordinance infringes her First Amendment right to freedom of speech. She sought a preliminary injunction so that she and her followers could sell MPAC T-shirts at the 1997 festivals, beginning with the blues festival on June 5. The district court granted the injunction, but imposed the condition that no more than five members of MPAC may engage in peddling at festivals sponsored by the City in Grant Park.

At argument we asked the City's lawyer what harm the City anticipated from so limited an injunction. The balance between the harm to the plaintiff if injunctive relief is denied and the harm to the defendant if it is granted is a critical consideration in deciding whether to grant a preliminary injunction, that is, an injunction that will expire when the case reaches final judgment. The City's brief had been silent on the issue; but at argument its lawyer said that the preliminary injunction had cast a cloud over the Peddlers' Ordinance and would encourage the filing of other lawsuits by "First Amendment" peddlers, threatening the crowded festivals (and the approach routes to

them) with paralyzing congestion. In view of the concern she expressed we emphasize that the granting of a preliminary injunction is not a decision on the merits of the plaintiff's suit. It is merely a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation, in the plaintiff's favor, for such time as it may take to determine whether the suit is, or is not, meritorious.

 Specifically, the court asked to grant such relief discounts (that is, multiplies) the harm to the plaintiff if it is withheld by the probability that in the end the plaintiff will prevail in the suit, and compares that discounted harm to the discounted harm to the defendant from granting the relief to the plaintiff. *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994); *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir.1994); *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593–94 (7th Cir.1986); *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 913 (9th Cir.1995). If the plaintiff has a very high probability of prevailing, the discount factor will be small, and if he can then show that he will be seriously and irreparably harmed unless he obtains preliminary relief, the injunction will probably be granted. But even a plaintiff who does not have a very high probability of ultimately prevailing will be entitled to preliminary relief if he faces very great irreparable harm and the defendant very little (unless third parties would be hurt). That is the case here, or so the district court found, and its finding is entitled to deference. *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir.1997); *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1393 (7th Cir.1992); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir.1996); *Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476, 479 (D.C.Cir.1996).

The magistrate judge determined on a preliminary and incomplete record that the Peddlers' Ordinance as concretized by the designation of the central district of Chicago as a no-peddling zone may violate the First Amendment rights of some peddlers, but all he has ordered is that five members of the plaintiff's group may peddle T-shirts at City-sponsored festivals in Grant Park. The incremental contribution to congestion that five peddlers can make in a sea of hundreds of thousands of festival-goers is very small; and should the magistrate judge's determination (or our decision) spark off a multitude of copycat suits, the plaintiffs in those suits will have to convince the district court that their incremental contribution to congestion will likewise be trivial—and at some point it will become impossible to make such a showing. This case is the first, and for all we know the last; and it would be wrong to hold it hostage to the merely speculative possibility of an avalanche of peddler litigation. And speculative it is; for so far as appears MPAC is the *only* advocacy group that wishes to *peddle* its First Amendment wares at the City's festivals, though some would like to set up booths—but that's a separate matter. There is no suggestion that MPAC's peddling at the festivals has ever been disruptive, violent, or obstreperous, which would magnify the impact of their small number on the festivals' decorum and amenities. The group peddled its T-shirts at the festivals without incident before the City changed its policy.

The City rents space in Grant Park during the festivals to Accent Chicago, a company that sells, among other merchandise, T-shirts. Accent Chicago is the only authorized purveyor of T-shirts in Grant Park during the festivals, though T-shirts are also sold in stores that are located in the central district and, not being peddlers, do not come within the ban of the ordinance. The City gets a fee and royalties from Accent Chicago for having given it the exclusive right to sell T-shirts and other merchandise in the park at festival time, and is concerned that the competition from peddlers might if unrestricted lead to a reduction in the City's take by reducing Accent Chicago's revenues. This may be a valid concern in the long run, but it is not activated by an injunction that allows five persons to sell T-shirts promoting the legalization of marijuana for the next few months until the suit is resolved. Accent Chicago does not sell a T-shirt that advocates the legalization of marijuana; so the competition is indirect. In technical economic terms, the critical issue concerning the impact of

MPAC's sale of T-shirts on the City's revenues is the cross-elasticity of demand between those T-shirts and the T-shirts sold by Accent Chicago. The cross-elasticity may be very low; that is, few patrons of Accent Chicago may consider Ayres and her crew an attractive alternative source of a T-shirt. There is certainly no evidence that the cross-elasticity is high, and it was the City's burden to show that it was. And, given MPAC's limited stock and the tininess of its sales force relative to the number of prospective customers for T-shirts at the festivals, the idea that the preliminary injunction could siphon substantial revenues from Accent Chicago and so derivatively from the City is the kind of fantasy that MPAC's campaign to legalize a psychotropic drug would, should it ever succeed, doubtless make more common.

So the harm to the City from the preliminary injunction is trivial; but the harm to MPAC from its denial would have been great. The festivals sponsored by the City attract literally millions of visitors every year, constituting an enormous potential audience for MPAC's message. The message concerns an important social issue, and the expression of opinion on such issues by means of paid advertising is close to the heart of the interests that the free-speech clause of the First Amendment protects. That the message might be unwelcome or that the mode of dissemination might strike us as foolish and counterproductive is not a relevant consideration.

So strongly does the balance of harms incline in the plaintiff's favor that she would not have to show a high probability of eventual success on the merits in order to be entitled to the limited preliminary relief that she obtained. But if she has no chance of winning, or even very little chance of winning, then the preliminary injunction should have been refused. *Aircraft Owners & Pilots Ass'n v. Hinson,* 102 F.3d 1421, 1428 (7th Cir.1996); *Smart v. Board of Trustees,* 34 F.3d 432, 435 (7th Cir.1994); *Tenacre Foundation v. INS,* 78 F.3d 693 (D.C.Cir.1996). Judges do not want to use their equitable powers to disrupt people's activities, and in this case to interfere with the operations of democratic government, at the behest of someone who has only a threadbare claim. So we must at least glance at the merits.

■■■ The T-shirts that the plaintiff sells carry an extensive written message of social advocacy; they are the equivalent of the sandwich boards that union pickets sometimes wear. On the one hand, there is no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment, and they do not lose their protection by being sold rather than given away. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981); *One World One Family Now v. City & County of Honolulu,* 76 F.3d 1009, 1012 (9th Cir.1996); *ISKCON of Potomac, Inc. v. Kennedy,* 61 F.3d 949, 953–54 (D.C.Cir.1995). On the other hand, no evidence has surfaced as yet—though it may eventually, since pretrial discovery has not been completed—that either the Peddlers' Ordinance or its application to Ayres is motivated by hostility to the message that she or other social advocates wish to communicate to the festival-goers; and indeed it would be odd for the City to ban all peddling within a huge area of the City just to get at Ayres and perhaps a few other First Amendment pests, as they might seem to many politicians. So there is no issue of "censorship" and we must ask instead whether the ordinance is so clearly a valid regulation of the time or place, as distinct from the content or viewpoint, of political speech that the plaintiff has no possible case. For such a regulation to be valid when it constrains speech in public places, such as streets and parks, that are traditionally open to people who want to engage in public speech, the regulation must not impede communication more than is necessary to achieve the legitimate and compelling public interest behind the regulation, while leaving ample alternative means for the people hit by the regulation to get their message out. E.g., *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) (and cases cited there); *One World One Family Now v. City & County of Honolulu, supra,* 76 F.3d at 1012.

In evaluating the validity of the regulation in issue here, the Peddlers' Ordinance, our focus shifts from the particular activities of the particular plaintiff, as when we were considering the balance of harms from the grant or denial of the preliminary injunction, to the entire range of activities that would be freed from regulation if the plaintiff prevailed. *Ward v. Rock Against Racism, supra*, 491 U.S. at 801, 109 S.Ct. at 2759; *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 296–97, 104 S.Ct. 3065, 3070–71, 82 L.Ed.2d 221 (1984); *Paulsen v. Gotbaum*, 982 F.2d 825, 829 (2d Cir.1992). For if Ayres is right that the ordinance is invalid as applied to her activities, the implication is that any and all "First Amendment" peddlers will be able to peddle their broadsheets, CDs, flags, banners, buttons, bumper stickers, and other First Amendment products during the festivals, and the aggregate effects could be substantial. Those effects would be relevant to the balance of harms from the granting of a preliminary injunction only if the injunction was being sought on behalf of a large number of the peddlers; but they are central to the issue on the merits, which is the constitutionality of the ordinance.

We do not understand the suggestion in the *One World* opinion that the relevant effects also include those of *commercial* peddling. 76 F.3d at 1014. Although the First Amendment is now understood to protect commercial as well as noncommercial speech, and speech is a component of all peddling as it is of all selling—selling requires that the seller acquaint the consumer with the characteristics of his product—the cases do not place significant limitations on the right of government to prevent the sale of goods or services that are not themselves forms of protected speech. E.g., *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *City of New Orleans v. Dukes*, 427 U.S. 297, 303–06, 96 S.Ct. 2513, 2516–18, 49 L.Ed.2d 511 (1976); *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124 (7th Cir.1995); *Mitchell v. Clayton*, 995 F.2d 772 (7th Cir.1993). So there is no reason to think that the validity of the Peddlers' Ordinance as applied to ordinary peddling will be undermined by this suit, however the suit comes out, although its practical efficacy might be somewhat undermined, as we shall see.

There are unquestionable benefits from regulating peddling, First Amendment or otherwise, in particular the two benefits that we have already mentioned: the control of congestion; and limiting competition with the city's own money-making activities, such as the granting of exclusive licenses to vend in exchange for a percentage of the vendor's revenues or some other form of fee. See *Heffron v. International Society for Krishna Consciousness, Inc., supra*, 452 U.S. at 649–51, 101 S.Ct. at 2564–66; *One World One Family Now v. City & County of Honolulu, supra*, 76 F.3d at 1013. The City also argues that the regulation of peddling is necessary to safeguard "aesthetic" interests. See *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805–07, 104 S.Ct. 2118, 2129–30, 80 L.Ed.2d 772 (1984). Given the demotic character of these festivals, and the fact that the plaintiff's peddling is not loud or boisterous and does not involve the erection of unsightly billboards or other obstructions to the visual enjoyment of Grant Park, the argument is strained. But the plaintiff may not be the only First Amendment peddler if she wins her suit, and, once again, the aggregate effects of such peddling, this time on the park's amenities, could conceivably be significant.

We agree with the City's lawyer, moreover, that it would be unreasonable to insist on a blanket First Amendment peddlers' exception even if we were confident that Ayres would have few emulators; the line would be difficult to draw and there would be a risk, as in the earliest of commercial-speech cases, *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), that commercial vendors would try to squeeze within the exception (turning it into a loophole) by affixing inconspicuous political messages (an MPAC logo perhaps?) to their merchandise. The City claims that this has already happened.

What is questionable about the Peddlers' Ordinance is not the ordinance itself but rather the size of the district that the city council has designated as a no-peddling zone.

It is much of downtown Chicago. It is one thing to ban peddlers, including (for the reasons suggested in the preceding paragraph) "First Amendment" peddlers, from Grant Park; it is another to ban the latter from the surrounding streets as well. The necessity for, and hence the reasonableness of, so extensive a ban is questionable. The case would be in a different posture if the designation had been limited to Grant Park, for then Ayres and her group could peddle their T-shirts to people entering and leaving the park. The wider the boundaries of the central district, the greater the restriction of free speech and the more attenuated the concerns that gave rise to the Peddlers' Ordinance in the first place.

■■ There are other ways, besides contracting the boundaries of the central district, by which the City might be able to protect its legitimate interests without restricting advocacy as much as it has done. It might insist on a royalty on Ayres's sales of her T-shirts, in order to limit the impact on the City's revenues of the competition (slight as it doubtless is) between Ayres and the City's franchisee, Accent Chicago. It might limit the size of Ayres's peddling operation, as the judge did in the preliminary injunction. It might require that peddling be confined to specified, fixed locations in or near the park, rather than allowing the peddlers to wander everywhere. So far as we are aware, the City has given no consideration to these less restrictive alternatives to the severe restriction on First Amendment advocacy brought about by the combination of the ordinance as currently drafted and interpreted with the expansive demarcation of the forbidden zone. The City is not constitutionally obligated to adopt the least restrictive approach that would secure its essential legitimate goals, *Ward v. Rock Against Racism, supra,* 491 U.S. at 800, 109 S.Ct. at 2758; *Matney v. County of Kenosha,* 86 F.3d 692, 696–97 (7th Cir.1996), because an approach can be more restrictive than imaginable without being highly restrictive. But in a case such as this in which the challenged regulation seems likely to obliterate the plaintiff's message, the existence of less restrictive alternatives that would protect the valid regulatory interest is material to the constitutional issue. In mentioning these we do not undertake to draw a roadmap of compliance; that would be premature, if only because the determination that the ordinance is invalid in its present form remains tentative, given the procedural setting of this appeal.

The City argues that a restriction on peddling should not be considered a real restriction of speech at all, because it does not prevent Ayres from giving away her T-shirts as distinct from selling them—indeed, she would get more takers, and thus spread her message more widely, if she gave the shirts away; advertising, whether commercial or political, is normally given away rather than sold. The giveaway option does make the City's impairment of MPAC's right of free speech less severe, and such options have figured in a number of decisions upholding regulations that prohibit solicitations by advocacy groups in public areas. *Friends of the Vietnam Veterans Memorial v. Kennedy,* 116 F.3d 495, 497 (D.C.Cir.1997); *One World One Family Now v. City & County of Honolulu, supra,* 76 F.3d at 1014–15; *ISKCON of Potomac, Inc. v. Kennedy, supra,* 61 F.3d at 958. But in all these cases except *One World,* the First Amendment solicitor had, in addition to the giveaway option, the possibility of selling its materials in proximity to the prohibited area, a factor repeatedly stressed in cases upholding bans on solicitation. E.g., *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 684–85, 112 S.Ct. 2701, 2708–09, 120 L.Ed.2d 541 (1992); *National Anti–Drug Coalition, Inc. v. Bolger,* 737 F.2d 717, 727–28 (7th Cir. 1984); *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 100 F.3d 175, 193 (1st Cir.1996); *United States v. Kistner,* 68 F.3d 218, 222 (8th Cir.1995). That possibility is eliminated in this case by the size of the no-peddling zone. There is no feasible way in which Ayres can sell her T-shirts to people attending the City's festivals; as far as she's concerned, Grant Park might be in the middle of Lake Michigan.

No reported appellate case upholds so extensive a ban merely because the giveaway door remained open except *One World,* and it is distinguishable because the plaintiff insist-

ed on its right to sell anywhere in the district from which it was banned. 76 F.3d at 1015. We add that the City's effort to distinguish between selling and giving away reduces the weight of the interests claimed to lie behind the ordinance. Congestion, for example, is no less if the T-shirts are given away rather than sold; true, each transaction takes longer if the good must be paid for, but by the same token there are fewer transactions than if the giver presses it into every passerby's hand. Of course Ayres might not be able to afford to give away her message-bearing T-shirts, and in that event there would be less congestion if sales were banned. But it would be less only because there was less advocacy.

To argue that the right of free speech is limited to cases in which speech is disseminated free of charge would amount to arguing that the City of Chicago could ban the sale of newspapers, since if newspapers were given away for nothing rather than being sold, even more people would "buy" them. Just as the publishers of newspapers defray a portion of their costs by the sale of their papers, so MPAC defrays a portion and perhaps the entirety of its costs by the sale of its T-shirts, which are to Ayres what the *New York Times* is to the Sulzbergers and the Ochs—the vehicle of her ideas and opinions. So there is a curtailment of speech here, and whether it is reasonable or not is in enough doubt to prevent us from concluding that Ayres's suit has only a slight chance of succeeding. Maybe the trial will result in striking a different balance between the interest in speech and the interest in regulation. Maybe the effort to distinguish *One World* will fail and we'll decide to adopt the Ninth Circuit's approach after all, despite the criticism of it suggested in this opinion. But on the record compiled and the arguments made in the proceedings to date, the district court did not abuse its discretion in granting the injunction.

AFFIRMED.