In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2627

WISCONSIN INTERSCHOLASTIC
ATHLETIC ASSOCIATION, and
AMERICAN-HIFI, INC.,

*Plaintiffs-Appellees*,

*v.*

GANNETT CO., INC., and WISCONSIN
NEWSPAPER ASSOCIATION,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 09-cv-155-wmc—**William M. Conley**, *Chief Judge*.

ARGUED JANUARY 14, 2011—DECIDED AUGUST 24, 2011

Before BAUER, WOOD, and HAMILTON, *Circuit Judges*.

WOOD, *Circuit Judge*. As the governing body for middle and high school athletic programs in Wisconsin, the Wisconsin Interscholastic Athletic Association (WIAA or Association) sponsors statewide post-season tournaments. In 2005, WIAA contracted with American-HiFi,

a video production company, to stream its tournament events online. Under this contract, American-HiFi has an exclusive right to stream nearly all WIAA tournament games. If American-HiFi elects not to stream a game, other broadcasters may do so after obtaining permission and paying a fee. Notably, the exclusive broadcast agreement between American-HiFi and WIAA concerns entire game transmission; it does not prohibit media coverage, photography, or interviews before or after games. Private media may also broadcast up to two minutes of a game, or write or blog about it as they see fit, so long as they do not engage in "play-by-play" transmission.

Taking the position that these exclusive license agreements violate a supposed First Amendment right to broadcast entire performances, newspapers owned by Gannett Co., Inc., decided to stream four WIAA tournament games without either obtaining consent or paying the fee. In response, WIAA filed this declaratory judgment action in state court asserting its right to grant exclusive licenses. After Gannett removed the case to federal court, the district court entered summary judgment in favor of WIAA.

On appeal, the only issue presented concerns the First Amendment as it might apply to WIAA's internet streaming rules. Gannett argues that WIAA, a state actor, cannot (ever, it seems) enter into exclusive contracts with a private company for the purpose of broadcasting entire events online, or, more broadly yet, to raise revenue. Gannett does not challenge other restric-

tions on media access to WIAA's events, or even WIAA's other exclusive licenses, like those WIAA has for television and radio broadcast. But the implications of Gannett's arguments are staggering: if it is correct, then no state actor may ever earn revenue from something that the press might want to broadcast in its entirety. That is not correct. Gannett's theory that coverage and broadcast are identical is both analytically flawed and foreclosed by *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977). Simply put, streaming or broadcasting an event is not the same thing as reporting on or describing it. In addition, Gannett overlooks the importance of the distinction between state-as-regulator and state-as- proprietor, which in turn leads it to fail to appreciate the fact that tournament games are a performance product of WIAA that it has the right to control. Thus, because the exclusive agreements between WIAA and American-HiFi are otherwise not contested, and we find no reason in the First Amendment to change them, we affirm the district court's judgment for WIAA.

## I

WIAA is a voluntary, nonprofit organization comprised of 506 public and private high schools and 117 junior high and middle schools in Wisconsin. Other than a few charter and online schools, all public high schools are members of WIAA. The Association's purpose is to govern, regulate, and control interscholastic sports in a manner that promotes the ideals of member schools, such as good citizenship and sportsmanship.

Another important goal is to create opportunities for schools to participate equally in athletics. WIAA accomplishes this by promulgating uniform statewide standards for competition and participation. The parties have stipulated that WIAA is a state actor. This means that its actions are constrained by the First Amendment. (We note that in other cases where courts had to decide if similar organizations were state actors, the answer has been yes. See, *e.g.*, *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001); *Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d 1315 (7th Cir. 1992).)

Though WIAA regulates both regular season games and post-season tournaments, it sponsors only the post-season tournaments, including regional and sectional events and the state championships. The dispute here concerns tournament games, which alone are subject to the Association's "Media Policies Reference Guide." The Media Policies are "produced to inform statewide media of WIAA policies in effect for all levels of State Tournament Series competition" and to "assist members of the media in providing comprehensive coverage to their communities." Many provisions in the Media Policies regulate press access but are not included in the present dispute: media must obtain credentials to cover a game, and each outlet may obtain only a limited number of spots (typically two per media outlet, including internet sites, but five for daily newspapers); credentialed media are permitted to take photographs, but must shoot in designated locations; and pre- and post-game interviews are permitted, but must be done at specified locations and times.

The Media Policies also include "Tournament Transmission Policies" applicable to radio, television, cable, and internet transmissions. These transmission rules reflect the underlying contracts WIAA has signed with private companies for the exclusive broadcasts of some sports. Those agreements stipulate that WIAA and "its exclusive rights partners retain the rights to all commercial use of video, audio, or textual play-by-play transmitted at a WIAA Tournament Series event." The Media Policies further provide that WIAA "owns the rights to transmit, upload, stream or display content live during WIAA events and reserves the right to grant exclusive and nonexclusive rights or not grant those rights on an event-by-event basis."

The Media Policies have specific provisions for commercial use of video; these apply both to television and online broadcast:

> A. There may not be live coverage of any live game action during the contests. "Live coverage" is defined as any activity which occurs while a game or meet is in progress. Stations or Web sites may use a backdrop of live action for reports from a tournament facility provided there is no play-by-play commentary and the report is limited to regularly scheduled news or sports programs and are [*sic*] no more than **two** minutes of a program which is any length.

> B. Use of film, video, audio, tape, etc., is limited to regularly scheduled news, sports programs or Internet site stories, and use of such content is limited to no more than **two** minutes of a web stream or

> program which is any length. Unless written approval is granted from the WIAA office, use of more than **two** minutes of film, video, audio, tape, or stream, etc., beyond five days from the last day of a tournament is prohibited without written consent of the WIAA.

These two-minute rules pertain to a transmission by broadcast or streaming (that is, to "uses"), but they do not limit recording. Thus, a news agency might potentially record an entire game and then review and edit it down to the two minutes it would like to use later.

The Media Policies include procedures for obtaining permission to stream a game if American-HiFi is not streaming it, or for requesting the broadcast of more than two minutes of a game. All media interested in "video transmission" of a WIAA tournament event must make arrangements with American-HiFi. Live or tape-delayed video transmission of games is prohibited without consent. When a media organization gets consent and streams a game, WIAA charges a set fee: $250 if one camera is used and $1,500 if more than one camera is used. The master copy of the video must be sent to American-HiFi, but the party who initially recorded it is entitled to a 20% royalty on any sale of that game to a third-party network or broadcaster.

Exclusive broadcast agreements are not new for WIAA. Quincy Newspapers, Inc., for example, has had an exclusive agreement to televise boys' basketball since 1968; it expanded that arrangement to girls' basketball and hockey in the 1980s. Likewise, Fox Sports Network Wis-

consin has had an exclusive contract to broadcast the state football finals since 2001. These rights naturally come with a price tag; both Quincy and Fox pay WIAA annually for them. In 2004, WIAA began to investigate how to improve upon its existing arrangements. First, it wanted to increase its revenues, especially since Quincy had recently negotiated for a much lower annual fee. Second, WIAA wanted to increase exposure to sports like wrestling or swimming that traditionally have received less coverage. An opportunity to make improvements on both of these fronts came in 2005 when American-HiFi's president submitted a proposal to deliver high-quality production, distribution, and transmission of WIAA events online. Subject to existing contracts like those just mentioned, in 2005 WIAA entered into a 10-year agreement with American-HiFi that gave the latter the exclusive rights to stream events online, but also set long-term production goals to ensure that the minor sports would receive additional exposure. (American-HiFi services this contract through its subsidiary When We Were Young Productions, but this distinction is immaterial, and so we refer to American-HiFi throughout.) To facilitate centralized viewing of games, American-HiFi created and manages WIAA's web portal, www.WIAA.tv, which contains all of WIAA's live broadcasts and sports coverage. In some instances, as contemplated by the 20% royalty, American-HiFi acts as WIAA's agent and sells further broadcast rights to third parties like Fox. Nonetheless, WIAA retains ultimate control over the web portal and ensures that any content is consistent with its purpose and mission.

This scheme may have suited WIAA well, but it was not popular with some newspapers in Wisconsin. The present case arose when, in an act of protest, one of Gannett's local newspapers deliberately streamed four playoff football games online without American-HiFi's consent and then refused to pay any fee. WIAA responded by filing an action for a declaratory judgment in state court. In its complaint, WIAA asked the court to declare that it has "ownership rights in any transmission, internet stream, photo, image, film, audiotape, writing, drawing or other depiction or description of any game" and "that it has the right to grant exclusive rights to others."

Rather than responding, Gannett, along with its co-defendant, the Wisconsin Newspaper Association (WNA), removed the case to federal court. (We refer to the two defendants collectively as Gannett unless the context requires greater specificity.) In support of federal jurisdiction, Gannett argued that WIAA's claim to ownership rights was really a copyright claim and thus WIAA's apparent state-law claim was "completely preempted" by the Copyright Act, 17 U.S.C. §§ 101 *et seq.* In its answer, Gannett asserted counterclaims challenging three aspects of the Media Policies: (1) restrictions on taking and selling photographs; (2) the prohibition on "text transmission" (or live-blogging) of games under the definition of "play-by-play" used to distinguish permissible periodic updates from text transmission; and (3) the prohibition on streaming tournament games online, and the consent and fee requirements for streaming residual tournament games not broadcast

by American-HiFi. These Policies, Gannett contended, gave rise to three actionable federal claims; two under 42 U.S.C. § 1983 for violations of the First Amendment right to freedom of the press and the Fourteenth Amendment's Equal Protection Clause; and one under the Copyright Act, on the theory that the newspapers owned any copyright in the games they had streamed without permission.

WIAA responded by amending its complaint to include three claims that narrowed its original complaint somewhat: it asserted that it had the right to exclusive control of the transmission of tournament games, the right to grant exclusive licenses, and the right to charge licensing or transmission fees. It also added a fourth claim, seeking a declaration that its "current policies concerning the internet transmission of its WIAA-sponsored tournament games do not violate Defendants' rights" under the First or Fourteenth Amendments or any other constitutional or statutory provision.

Both parties moved for summary judgment, and the district court entered judgment for WIAA. In so doing, the court noted that both parties had abandoned any claims related to the photography policy and forfeited any arguments related to the definition of "play-by-play" in the live-blogging policy. The only issues left were (1) whether the exclusive contract for internet streaming violates the First or Fourteenth Amendments, (2) whether the fee charged to newspapers to stream games that American-HiFi elects not to broadcast violates the First Amendment, (3) whether WIAA has too much discretion

to refuse licenses to media companies that want to stream games, and (4) whether the newspapers have a copyright in the four games they streamed without consent. After engaging in a thorough "forum analysis" in response to Gannett's argument that WIAA has created a designated public forum for media coverage of tournament events, the district court found media access at tournaments to be a "nonpublic forum" and evaluated the First Amendment issues for reasonableness and viewpoint neutrality. Finding those standards easily met for the exclusive contract, the district court quickly disposed of the remaining issues. Gannett now appeals.

## II

Before proceeding to the merits of the appeal, we must explain why we have concluded that the federal courts have jurisdiction over this dispute. Throughout these proceedings, the basis of federal jurisdiction has been uncertain, and the district court never ruled on it explicitly. The parties are not diverse, which means that removal to the district court must be based upon a federal question. See 28 U.S.C. §§ 1331, 1441(b). The federal question must be part of the plaintiff's well-pleaded complaint; jurisdiction may not be "predicated on an actual or anticipated defense." *Vaden v. Discover Bank*, 129 S. Ct. 1262, 1272 (2009), citing *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1908).

At oral argument, we noted that the parties had failed to specify exactly what it was that supported federal jurisdiction. Gannett offered the theory that WIAA

was "really" raising a copyright claim in state court, and that such a claim was necessarily federal and thus "completely preempted." WIAA said little, assuming that its request for a declaration stating that its contracts did not violate the First Amendment was enough to bring the federal issue into the complaint. In order to be sure that WIAA was not in essence doing the same thing as the Mottleys (*i.e.* that it was not anticipating a defense to the enforceability of its contracts), we asked for supplemental briefing. We also wanted to ensure that the rule of *T.B. Harms Co. v. Eliscu*, 339 F.2d 823 (2d Cir. 1964) (Friendly, J.), did not reveal this case to be one arising solely under state law. See also *International Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 915-16 (7th Cir. 2001). Under *T.B. Harms*, a claim "arises under" the Copyright Act "if and only if the complaint is for a remedy expressly granted by the Act," like a suit for infringement or to recoup royalties. 339 F.2d at 828. A contract dispute about who owns a particular copyright does not give rise to jurisdiction. *Id.* at 824; *Nova Design Build, Inc. v. Grace Hotels, LLC*, No. 10-1738, 2011 WL 3084929, at *2 (7th Cir. July 26, 2011).

We address the *Eliscu* theory first. When all is said and done, we are convinced that this case has nothing to do with copyright. One prerequisite to bringing a suit for infringement is that a party register its copyright. 17 U.S.C. § 411(a). Though that rule is not jurisdictional, see *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010), it still reflects an important case-processing principle, and it is notable that neither WIAA or Gannett has registered anything here. More than that, neither

party has briefed any issues related to copyright in this court. Indeed, even the status of the four contested videos is not within the ambit of this appeal.

That seriously undermines Gannett's elaborate theory that original federal question jurisdiction can be based on the idea of "artful pleading" or "complete preemption." See *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 24 (1983). As we have noted before, the phrase "'complete preemption' is a misnomer, having nothing to do with preemption and everything to do with federal occupation of a field. The name misleads because, when federal law occupies the field (as in labor law), every claim arises under federal law." *Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000). Ordinary, or "conflict" preemption is a federal defense to a plaintiff's state-law claim and thus cannot serve as a basis for the federal court's power under § 1331. *Vorhees v. Naper Aero Club, Inc.*, 272 F.3d 398, 403 (7th Cir. 2001). We are aware that some courts have held, either explicitly or implicitly, that certain state-law claims related to the media's use of a performance have been completely preempted by the Copyright Act. See, *e.g.*, *Ritchie v. Williams*, 395 F.3d 283, 287-89 (6th Cir. 2005); *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 303-06 (2d Cir. 2004); *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 230-33 (4th Cir. 1993). We are not so certain. *Cf. Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik,* 510 F.3d 77, 99-102 (1st Cir. 2007) (Cyr, J., dissenting) (discussing narrowness of complete preemption and arguing against finding it under the Copyright Act for a dispute between co-owners of a work); *Vorhees*,

272 F.3d at 403-04 (describing the rarity of complete preemption); Elizabeth Helmer, Note, *The Ever-Expanding Complete Preemption Doctrine and The Copyright Act: Is this What Congress Really Wanted?*, 7 N.C. J. L. & TECH. 205, 227-30 (2005). That said, this is not the case in which further consideration of that question is necessary. It turns out here that the Copyright Act is a red herring. The question before us is whether WIAA's request for a declaratory judgment that settles Gannett's First Amendment arguments is within federal jurisdiction. Whether the contents of the broadcasts were protected by copyright is beside the point.

The pivotal fact here is that WIAA is suing for a declaratory judgment. This is not, of course, to say that the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, furnishes an independent basis of jurisdiction; it does not. See *Medical Assurance Co., Inc. v. Hellman,* 610 F.3d 371, 377 (7th Cir. 2010). But the proper analysis of jurisdictional questions, including in particular *Mottley*'s well-pleaded complaint rule, operates uniquely in this context. Here, the "realistic position of the parties is reversed," *Public Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 248 (1952), and to determine "whether a declaratory-judgment action comes within federal jurisdiction, a court must dig below the surface of the complaint and look at the underlying controversy. If a well-pleaded complaint by the defendant (the 'natural' plaintiff) would have arisen under federal law, then the court has jurisdiction when the 'natural' defendant brings a declaratory-judgment suit." *NewPage Wis. Sys. Inc. v. United Steel, Paper & Forestry*, No. 10-2887, 2011 WL 2684910, at *2 (7th Cir.

July 12, 2011); see also *Samuel C. Johnson 1998 Trust v. Bayfield County*, Nos. 09-2876, 09-2879, 2011 WL 2417020, at *1 (7th Cir. June 17, 2011).

We turn to WIAA's amended complaint, which is the operative document. *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 705-06 (1972); *cf. Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 56 (2d Cir. 1996) ("[I]f a district court erroneously exercises removal jurisdiction over an action, and the plaintiff voluntarily amends the complaint to allege federal claims, we will not remand for want of jurisdiction."). WIAA's amended complaint plainly invokes federal law: it wants a declaration that its current policies and contracts do not violate Gannett's or any other defendant's rights under the First or Fourteenth Amendment. The issue is whether that federal element is present by way of a claim or if it is just an anticipated defense in a presumed suit brought by Gannett against WIAA. We conclude that it is the former. As Gannett's counterclaims indicate, the newspapers believe that section 1983 provides them with a right of action. In essence, they are charging that a state actor (WIAA) is unlawfully censoring their speech through its Media Policies. That is a claim that arises under federal law. See generally *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011); *Citizens United v. Federal Election Comm'n,* 130 S. Ct. 876 (2010).

In fact, any worries that one might have about whether this "presumed suit" by the newspapers is wholly imaginary is belied by the record before us. Months before WIAA filed its initial complaint, the Newspaper Associa-

tion sent WIAA a letter challenging on First Amend-
ment grounds the Media Policies' treatment of internet
streaming and WIAA's contract with American-HiFi.
The letter demanded that WIAA "rescind its ['patently
unconstitutional'] media policies on internet streaming."
After the parties met, WNA was still dissatisfied and sent
another letter indicating that it was "time to challenge,
and if necessary, test in court, WIAA's authority to grant
exclusive coverage rights." The federal claim in the
amended complaint responds directly to these threats.

For these reasons, we are satisfied WIAA's complaint
for a declaratory judgment that its Media Policies are
compatible with the First Amendment states a claim
arising under federal law. We therefore move on to the
merits.

### III

As this suit has proceeded through the courts the
precise issue at stake has been a moving target. We noted
a moment ago that Gannett and WNA have abandoned
any claims they might have had to copyright protection
for the four videos streamed by the newspapers. Their
equal protection contentions have met the same fate. This
appeal thus has been reduced to the following question:
Whether WIAA's contract granting American-HiFi
the exclusive right to stream tournament games and
requiring consent and payment for third-party broadcasts
of entire games violates the First Amendment.

As the briefing reflects, there are a litany of possible
First Amendment doctrines that *could* be at play

when answering such a question. The real challenge is to understand what really needs to be decided and what is peripheral. Viewed in the proper light, as we explain below, WIAA's Media Policies do not, as Gannett, WNA, and additional newspapers as *amici* fear, threaten the fundamental right of the press to comment on and cover school sporting events. An exclusive contract for transmission of an event is not a gag order or "prior restraint" on speech about government activities. The media are free under the policy to talk and write about the events to their hearts' content. What they cannot do is to appropriate the entertainment product that WIAA has created without paying for it. WIAA has the right to package and distribute its performance; nothing in the First Amendment confers on the media an affirmative right to broadcast entire performances.

A

We begin by considering the kind of government action at issue here. *NASA v. Nelson*, 131 S. Ct. 746, 757 (2011). State ownership or control of property does not automatically open that property to the public wholesale. *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). Where the state acts as a proprietor, rather than a regulator, "its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *International Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992). Accordingly, "time and again" courts have recognized that the government has a "much freer hand," *Nelson*,

131 S. Ct. at 757, when it operates in a proprietary mode rather than as a regulator. *Lee*, 505 U.S. at 678; see also, *e.g.*, *United States v. Kokinda*, 497 U.S. 720, 725-26 (1990) (plurality); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (plurality); *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 79 (1st Cir. 2004) ("[A] lower level of scrutiny usually applies when the government acts as proprietor."). That said, even when acting in a proprietary capacity, state actors do not "enjoy absolute freedom from First Amendment constraints." *Kokinda*, 497 U.S. at 725. In this situation, the First Amendment mandates that government action be reasonable, *i.e.*, it may not be "arbitrary, capricious, or invidious," *Lehman*, 418 U.S. at 303; *Kokinda*, 497 U.S. at 726.

Gannett argues that, at a minimum, WIAA cannot engage in discrimination on the basis of viewpoint when granting exclusive license contracts or in determining whether to approve a request to stream a game not being broadcast by American-HiFi. But we are at a loss to see any viewpoint bias in the Media Policies. As far as we can tell, Al-Jazeera would have the same right to purchase media access to WIAA's games as the Christian Broadcasting Network, Comedy Central, Fox, or MSNBC. Gannett has equated viewpoint with exclusivity for the primary contract, but that is really just a global challenge to WIAA's right to enter into any broadcast agreement at all; we address that point below. Just in case we have missed something, we note further that while the First Amendment requires viewpoint neutrality in many other contexts, that constraint is inapplicable here. Instead, *Arkansas Educational Television*

*Commission v. Forbes*, 523 U.S. 666 (1998), holds that in the sort of situation presented before us, viewpoint neutrality is inapplicable. In *Forbes*, the Supreme Court described how the First Amendment operates in the context of broadcast journalism for a publicly owned television station. Outside of a political debate, which has a unique function in our democracy, see *id.* at 675-76, decisions about who gets air-time or what to broadcast are left to the journalistic and editorial judgment of the broadcaster, unconstrained by a viewpoint-neutrality requirement. See *id.* at 673 ("As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination.").

Though WIAA is not the broadcaster of a television show in the traditional sense, we find no meaningful distinction between the online setting and more traditional media. Through its contract with American-HiFi—like its arrangements with Quincy and Fox—rather than producing or editing footage by itself, WIAA maximizes efficiency by using a specialist that remains subject to WIAA's authority and control. A glance at the "WIAA Network" web portal, a part of the "WIAA School Broadcasting Program," confirms this understanding. The website functions as an online "channel" where all WIAA "network events," *i.e.*, tournament games, can be streamed. Notably, each page on the site is headlined with WIAA logo and often a banner bearing the Association's name. As further evidence of the school-based collaboration and editorial judgment involved in creating this internet "television station," other school events—like plays, band concerts, gradua-

tion speeches, spelling bees, and even an anti-bullying speaker—are featured on WIAA.tv.

When "establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from . . . the viewpoint neutrality requirement." *Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005). What is important for purposes of the First Amendment is that the government is sending a message, which can come by funding a group or project, sponsoring an event or performance, or by selecting and editing content. See *Forbes*, 523 U.S. at 674 ("Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts."); *Chicago Acorn v. Metro. Pier & Exposition Auth.* (*Navy Pier*), 150 F.3d 695, 701 (7th Cir. 1998) ("Whenever the government is in the business of speech, whether it is producing television programs or operating a museum or making grants or running schools, the exercise of editorial judgment is inescapable."). It makes no difference whether the state conveys this message directly or instead "chooses to employ private speakers to transmit its message." *Chiras*, 432 F.3d at 613; *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) (explaining that when government uses "private speakers to transmit specific information pertaining to its own program," it has the right to control that message based upon content or viewpoint). Indeed, even Gannett concedes that WIAA enters into exclusive media contracts to avoid losing "control over

the message" expressed at events, which is why WIAA retains the right to revoke transmission rights if a broadcaster transmits "content or comments considered inappropriate or incompatible with the educational integrity" of a WIAA event. (Though we find WIAA to be engaged in some expression, consistent with *Forbes*, we see no need to go further and consider whether the Media Policies constitute "government speech" in the stronger sense described in *Pleasant Grove v. Summum*, 129 S. Ct. 1125, 1131 (2009); such a conclusion would remove any First Amendment scrutiny from this context altogether.)

In an effort to convince us that heightened scrutiny is warranted, Gannett implores us to engage in "forum analysis" and classify some aspect—we are not sure exactly which—of the Media Policies as a "designated public forum." We find forum analysis unhelpful here, and so we do not pursue that line of inquiry. See *Forbes*, 523 U.S. at 666 (concluding that "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine"); *Chiras*, 432 F.3d at 613 (interpreting *Forbes* to exclude forum analysis in a public school context); *cf. Illinois Dunesland Pres. Soc. v. Illinois Dep't of Nat. Res.*, 584 F.3d 719, 723-24 (7th Cir. 2009) (discussing shortcomings of forum analysis); *Ridley*, 390 F.3d at 75 (noting that forum analysis "has been criticized as unhelpful in many contexts," and particularly where the government is operating in a proprietary capacity).

B

Now that we have established that WIAA is functioning as the creator and disseminator of content, we can identify the Supreme Court's decision in *Zacchini v. Scripps-Howard Broadcasting*, *supra*, as the authority that governs the resolution of this dispute. There, the Court addressed the question whether the First Amendment gave a television station an affirmative defense to Hugo Zacchini's claim that the station unlawfully filmed and broadcast his 15-second "human cannonball" act. 433 U.S. at 563. Performing at a state fair, Zacchini asked a reporter not to film the routine, but the reporter recorded it anyway and played the whole act on the evening news. *Id.* at 563-64. The Court emphasized that the nature of the reporter's action was key. If the television company had "merely reported" that Zacchini "was performing at the fair and described or commented on his act," the case would have been "very different." *Id.* at 569. But Zacchini was not arguing the media could not report on his routine. He was complaining that the station "filmed his entire act and displayed that film on television." *Id*. The distinction between coverage or reporting on one hand, and broadcast of an "entire act" on the other, was central to *Zacchini*. See *id.* at 574 (distinguishing precedent involving "the reporting of events" from "an attempt to broadcast or publish an entire act"). Regardless of where that line is to be drawn in close cases, the Court was "quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Id.* at 575.

*Zacchini* also recognized that the ability to control broadcast of one's performance does not just happen to be consistent with the Constitution; it also provides an important economic benefit. See *id.* at 576-78. Interpreting the First Amendment to provide the media with a right to transmit an entire performance or to prohibit performers from charging fees would take us back centuries, to a time when artists or performers were unable to capture the economic value of a performance. Over the long run, this would harm, not help, the interests of free speech. The First Amendment requires no such folly.

In short, *Zacchini* establishes two propositions that guide our resolution of this case. First, it distinguishes between the media's First Amendment right to "report on" and "cover" an event and its lack of a right to broadcast an "entire act." Second, *Zacchini* makes clear that the producer of entertainment is entitled to charge a fee in exchange for consent to broadcast; the First Amendment does not give the media the right to appropriate, without consent or remuneration, the products of others. Finally, *Forbes* indicates that these principles apply to state actors as well as private actors.

C

The foregoing allows us to clarify what is at stake in this lawsuit. The district court thought that the type of speech mattered for First Amendment purposes; it reasoned that "the same First Amendment scrutiny to limitations on access to a political event do not necessarily apply to limitations on a sports tournament." To

the extent that this statement credits WIAA's assertion that sports reporting lies on the periphery of protected speech or implies that reporting on sports events deserves less protection than reporting on political events, we reject that view. The fact that, to some, sports might be "mere" entertainment does not change the analysis. (Indeed, one of the most famous free speech decisions in our history involved a novel, surely one form of entertainment. See *United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934) (holding that the novel was not obscene for purposes of the Tariff Act of 1930).) There is no basis for a rule that makes the press's right to coverage depend on the purported value of the object of their coverage.

Second, it is significant that no one is challenging WIAA's credentialing policies. If there were some indication that WIAA was discriminating at that level on the basis of viewpoint, we would have a different case. We have no quarrel with Gannett's argument that "coverage is not without opportunity for viewpoint discrimination." But as we have explained, that point does not lead to the conclusion that WIAA has no protectible rights in the dissemination of the entire sporting event.

Third, Gannett's complaint that the exclusive licensing agreements are a form of "prior restraint" on media speech is also misplaced. Nothing here amounts to "censorship" in the sense of an "effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive." *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir.

2001). In a broadcast situation—as *Zacchini* and *Forbes* demonstrate—our focus is on the performer's (*i.e.*, the speaker's) efforts to control its own message. No one is telling the press what to say about the event. To the contrary, under the Media Policies a newspaper can record an entire event and edit it down to the two minutes it wants to broadcast, consistent with its own editorial discretion. The exclusive streaming provisions of the Media Policies do not censor or regulate the content of such coverage at all.

Finally, this is not the same as the cases in which an official has "unbridled discretion" to grant or deny a permit to a speaker. *E.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988). Gannett argues that the Media Policies give too much discretion to American-HiFi over who is allowed to broadcast the residual games it does not stream. The analogy is inapt. In the "unbridled discretion" context, the private speaker has some First Amendment right to engage in the speech activity. For example, people who wish to parade have a right to express themselves, and so there must be limits on the discretion of authorities who grant parade permits. See *Saia v. New York*, 334 U.S. 558, 559-60 (1948). Even so, the state is entitled to impose time, place, or manner restrictions as long as they are viewpoint neutral, narrowly tailored, and leave open ample alternative channels of communication. *MacDonald v. City of Chicago*, 243 F.3d 1021, 1032 (7th Cir. 2001). But here, as *Zacchini* makes clear, the newspapers do not have the underlying right to broadcast an entire event, and *Forbes* adds that our focus is on the product and message being

displayed by WIAA. For that reason, cases addressing licensing or permitting regimes for speakers and performers or public park-goers are inapplicable. *E.g.*, *Kunz v. New York*, 340 U.S. 290 (1951). On this record, cases that worry about fees that discriminate according to viewpoint are inapposite as well. *E.g.*, *Forsyth County v. The Nationalist Movement*, 505 U.S. 123 (1992).

D

The only remaining question we must address is whether there is any reason grounded in the First Amendment why WIAA might not be entitled to enter into these agreements for the purpose of raising revenue. Gannett argues that the government, even in a proprietary capacity, cannot raise revenue. This is a radical and unsupported position, and the law is 180 degrees to the contrary: governments in fact have a legitimate and substantial interest in raising revenue in this way. See, *e.g.*, *Navy Pier*, 150 F.3d at 702-03; *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 775 (2d Cir. 1984).

To succeed, Gannett would have to convince us to disregard *Lehman v. City of Shaker Heights*, *supra*, which we have neither the power nor the inclination to do. In *Lehman*, the Supreme Court considered an exclusive contract between a city and private advertiser that limited access to advertisement space on public buses. 418 U.S. at 299-300. Like American-HiFi, the private company served as the city's exclusive rights holder and

agent. The contract prohibited the private advertiser from selling ad space if the buyer had a political message, *id.*, but private companies' ads—even those for cigarettes or liquor—were permissible. A candidate for local office challenged the contract, but the Supreme Court sustained it, even though it excluded political advertising. Justice Blackmun, who announced the judgment for the plurality, described advertising as "incidental to the provision of public transportation," and part of the city's "commercial venture." *Id.* at 303. In such an instance, limiting access to advertising space to raise revenue was a "reasonable legislative objective[] advanced by the city in a proprietary capacity." *Id.* at 304.

We came to a comparable result in *Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997). There, pursuant to a local ordinance, Chicago had authorized one vendor to sell t-shirts at the "Taste of Chicago," a large publicly sponsored festival. In exchange for the "exclusive right to sell T-shirts and other merchandise in the park at festival time," the City received a fee and royalties from gross sales. *Id.* at 1013. In considering a First Amendment challenge to the ordinance by a vendor who wanted part of the action, we noted that "unquestionable benefits" came from the arrangement. Those benefits included "limiting competition with the city's own money-making activities, such as the granting of exclusive licenses to vend in exchange for a percentage of the vendor's revenues or some other form of fee." *Id.* at 1015.

Other courts considering exclusive broadcast agreements between a government entity and a private party

have universally, as far as we can tell, reached the same conclusion. Gannett, at least, has shown us no case where an exclusive broadcast agreement has been invalidated on First Amendment grounds. For instance, in *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commission,* the Eighth Circuit considered a city's exclusive contract with a private company to put up advertisements in a publicly financed sports complex. 797 F.2d 553 (8th Cir. 1986). After discussing *Lehman* and noting that the stadium was a proprietary venture, *Hubbard* credited the city's rationale of allowing "a small number of commercial advertisers access to a limited amount of advertising space on government property in order to generate revenue." *Id.* at 556. For First Amendment purposes, this was a "reasonable objective" and therefore constitutional. *Id. Jacobsen v. City of Rapid City* similarly held that a small municipal airport did not violate the First Amendment by giving its only gift shop the exclusive right to sell newspapers. 128 F.3d 660 (8th Cir. 1997). As the court put it, "[f]rom a proprietary perspective, it is presumptively reasonable for the manager of a small airport to conclude that granting one gift shop concessionaire the exclusive right to sell consumer products in the terminal will both maximize that type of leasing revenues and minimize leasing costs by eliminating the need to negotiate with many different types of vendors." *Id.* at 664. Likewise, the Eleventh Circuit rejected a First Amendment and equal protection challenge to a public university's decision to grant a photographer an exclusive contract to take pictures at graduation ceremonies. *Foto USA, Inc. v. Board of Regents of the Univ. Sys. of Fla.,* 141 F.3d 1032 (11th Cir. 1998).

More broadly, it is well known that exclusive contracts are common because they "reasonably serve to maintain or enhance the value of an artistic or intellectual product." *Home Box Office, Inc. v. FCC*, 587 F.2d 1248, 1253 (D.C. Cir. 1978). *Home Box Office* was an antitrust case that reflected the wide body of economic literature demonstrating the substantial value of exclusive licensing agreements. See, *e.g.*, Jan B. Heide *et al., Exclusive Dealing and Business Efficiency: Evidence from Industry Practice,* 41 J.L. & ECON. 387 (1998); Richard M. Steuer, *Exclusive Dealing After* Jefferson Parish, 54 ANTITRUST L.J. 1229 (1985).

It is no surprise, then, that several *amicus* briefs supporting WIAA emphasize the need for exclusive contracts in sports broadcasting to help school districts raise revenue that is not likely to come from elsewhere. The National Federation of State High School Associations contends that if they were "not allowed to enter into and enforce . . . exclusive agreements, their ability to promote the benefits of interscholastic activities would be significantly diminished." Statewide associations analogous to WIAA push the same point: revenue raised from exclusive contracts is vital to making sponsorship of statewide events possible, and this is why the vast majority of these associations "grant transmission rights to third parties on an exclusive basis." Even if exclusive agreements did not *actually* raise significant revenue beyond what could be raised with non-exclusive agreements or a system without agreements at all, the fact remains that federal courts are not price-boards, and legality does not depend on a successful business projec-

tion. The only point is that state entities, like private entities, may have valid reasons for choosing this method of distribution.

E

We could stop here, but we think it important to say a word about the broader implications of Gannett's argument. The principles at stake in this case are not limited to the streaming or broadcast of a few high school tournament games in an upper-Midwest state. For example, the distinction between coverage and transmission of an "entire event" is also important in cases involving the right of public access. In these cases, the public and media often have the right—either by statute or even the Constitution (see *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980))—to attend a public proceeding like an execution or trial. Although there may be an affirmative right to be present, the Supreme Court has not yet recognized any corollary right guaranteed by the First Amendment entitling the media to record, let alone broadcast live, what happens at that proceeding. See, *e.g.*, *Rice v. Kemper*, 374 F.3d 675, 678 (8th Cir. 2004) ("[N]either the public nor the media has a First Amendment right to videotape, photograph, or make audio recordings of government proceedings that are by law open to the public."); *United States v. Kerley*, 753 F.2d 617, 620-21 (7th Cir. 1985) (holding that the public has no First Amendment right to videotape a public trial despite the fact that *Richmond Newspapers* guarantees right of access).

State actors use exclusive contracts regularly without any thought that they are violating the First Amendment. For instance, the Wisconsin Alumni Research Foundation (WARF) patents innovations made by the scientific community at the University of Wisconsin at Madison. The University relies on a private party, WARF, to solicit and obtain third-party licensing fees. The revenue from these agreements is substantial: WARF currently pays an average of $45 million annually to the University and has returned $1.07 billion to the school since 1928. See generally Wisconsin Alumni Research Foundation, www.warf.org (last visited Aug. 19, 2011). Gannett's claim here would cast a shadow over the commercial licenses that WARF sells, by implying that the First Amendment requires it to dedicate its inventions to the public. No case has ever come close to holding this.

The logical implications of Gannett's argument are breathtaking. Suppose a high-school orchestra were to perform one of Bach's Brandenburg Concertos or the drama club put together a rendition of *Othello* (both of which are in the public domain). Gannett's argument would require the conclusion that the students have no right to engage in the common practice of packaging their performance and selling it to raise money for school trips. For example, in Washington State, high school students team with a local college to record CDs and sell them online to raise money for high school music programs. See KPLU, School of Jazz, http://schoolofjazz.org/ (last visited Aug. 19, 2011). Similarly, the McCracken Middle School Band in Skokie, Illinois, sells its performance

recordings online. www.mccrackenband.com/resources/ recordings/ (last visited Aug. 19, 2011). These examples could be multiplied almost endlessly. We can see no reason to enjoin such a practice, or to require the schools to destroy the economic value of their performances by permitting unlimited free transmissions. Gannett's theory misses the distinctive aspect of what the students are selling. They are not selling Bach's concerto or Shakespeare's play; they are selling their own, unique performance. WIAA does the same thing for high school and middle school sports in Wisconsin. Gannett's theory would prevent the schools from retaining the economic benefit of these events; instead, it would effectively transfer whatever benefit remained after the destruction of exclusivity to the private media.

The idea that reporting and streaming are synonymous is also at odds with experience in the private sector. There, everyone understands that there is a difference between a description of an event like the Super Bowl, Women's World Cup, or the College World Series and the right both to videotape that entertainment and then to publish it as one sees fit. In each of these situations the producer of the entertainment—the NFL, FIFA, or the NCAA—normally signs a lucrative contract for exclusive, or semi-exclusive, broadcast rights for the performance. Meanwhile, all media report on the events. *Cf. Home Box Office*, 587 F.2d at 1253 ("Contracts conferring the exclusive right to broadcast sporting events and artistic or theatrical performances are commonplace."). Gannett's argument boils down to an assertion

that a government actor cannot, under any circumstances, act like the NFL, FIFA or NCAA. But the First Amendment does not require such a draconian rule. *Lehman* and *Ayres* could not have reached the conclusions they did if this were true. In fact, the tendency is the other direction: to allow state actors performing commercial or proprietary actions the same latitude afforded their private counterparts. See *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) (noting that courts "hesitate to impose in the name of the Constitution extravagant burdens" on public entities that similar private entities do not bear).

**IV**

We conclude that WIAA's exclusive broadcasting agreements for internet streaming are consistent with the First Amendment. This conclusion, as *Zacchini* implies, also supports WIAA's right to charge a fee to a broadcaster wishing to stream a game that American-HiFi has decided not to publish. It is not, as Gannett contends, a "special tax on the press." *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 576 (1983). WIAA is not prohibiting the media from reporting on its events, nor is it imposing outrageous fees for media members to have access to games. It does not require the media to submit stories or blog posts to its editors before they are published. Any of those actions would make this a significantly different case. In the case before us, while our reasons differ from those that

the district court gave, our ultimate conclusion is the same. WIAA is entitled to summary judgment in its favor, and we therefore AFFIRM the judgment of the district court.